In re:

Curtis C. Nelson,

          Debtor.

Bky. No. 11-43113(RJK)

Chapter 11

---

Crown Bank,

          Plaintiff,

v.

Curtis C. Nelson,

          Defendant.

Adv. No. 11-04196

## NOTICE OF HEARING AND MOTION FOR SUMMARY JUDGMENT

TO:    The Debtor and other entities specified in Local Rule 9013-13

1.    Crown Bank, the Plaintiff in the above-entitled adversary proceeding, hereby moves the Court for the relief requested below and gives notice of hearing.

2.    The Court will hold a hearing on this motion on October 5, at 10:30 a.m. before the Honorable Robert J. Kressel in Courtroom 8W, United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, or as soon thereafter as counsel may be heard.

3.    Any response to this motion must be filed and served not later than September 30, which is five days before the time set for the hearing (including Saturday, Sundays, and

holidays).  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      This court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Bankruptcy Rule 5005, and Local Rule 1070-1.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  The petition commencing his chapter 11 case was filed on May 2, 2011. The case is now pending in this court.

5.      This motion arises under Bankruptcy Rules 7056 and 9006.  This motion is filed under Bankruptcy Rule 9014 and Local Rule 9013-2.  In this motion, Crown Bank requests that the Court grant it summary judgment and declare that the Debtor's debt to Crown Bank is non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).

WHEREFORE, Crown Bank respectfully requests that this Court enter an order granting summary judgment:

1.      Granting Counts I and II in Crown Bank's complaint;

2.      Declaring that Judge Sommerville's factual findings of fraud in the Order for Pre-Judgment Attachment and Judge Klein's Order for Judgment in the amount of  $3,800,000.00 (in Court File No. 27-CV-10-24189) have preclusive effect on this adversary proceeding and thus Curtis C. Nelson is collaterally estopped from denying that he obtained his debt from Crown Bank through false representations and by use of a materially false financial statement;

3.      Declaring that the facts demonstrating fraud are undisputed and thus Crown Bank is entitled to summary judgment as a matter of law;

4.      Declaring that the defendant's debt to Crown Bank in the amount of $3,800,000.00 is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B); and

5.      Such further relief as this court deems just and proper under the circumstances.

Dated: September 21, 2011

OPPENHEIMER WOLFF & DONNELLY LLP

By: _____/e/ David B. Galle_____

Christine Lindblad (MN #277666)
David B. Galle (MN #311303)
Michelle Schjodt (MN #0390490)
Elizabeth A. Patton (MN #0391431)
3300 Plaza VII
45 South Seventh Street
Minneapolis, Minnesota  55402
Telephone:  (612) 607-7000
Facsimile:      (612) 607-7100

ATTORNEYS FOR PLAINTIFF CROWN BANK

In re:

Curtis C. Nelson,

the Debtor.

Bky. No. 11-43113(RJK)

Chapter 11

Crown Bank,

Plaintiff,

v.

Curtis C. Nelson,

Defendant.

Adv. No. 11-04196

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Crown Bank respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment, in which Crown Bank seeks a determination that Curtis C. Nelson's ("Nelson") debt to Crown Bank is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). On December 28, 2010, Hennepin County District Court Judge John J. Sommerville entered an Order for Pre-Judgment Attachment against Nelson finding that "the affidavits, exhibits and oral testimony establish that Defendant [Nelson] has committed an intentional fraud upon Crown Bank."[1] Fifteen days later, Nelson consented to an order for

---

[1]   To establish pre-judgment attachment, Crown Bank was required to meet the conditions set forth in Minn. Stat. § 570.026 subd. 3, which states as follows:  An order for attachment may

judgment in the principal amount of $3,800,000. Shortly thereafter, the state court entered judgment in favor of Crown Bank against Nelson in the principal amount of $3,800,000.00. Crown Bank contends that (1) the doctrine of collateral estoppel gives preclusive effect both to the state court findings of fact on fraud and to the state court judgment in the amount of $3,800,000.00; and alternatively, (2) even in the absence of collateral estoppel, the undisputed facts justify that this court find that Nelson's debt to Crown Bank is nondischargeable.

## FACTUAL BACKGROUND

### I.    CIVIL LAWSUIT

On October 19, 2010, Crown Bank filed a lawsuit against Nelson in the District Court, Hennepin County, captioned *Crown Bank vs. Curtis C. Nelson* (Court File No. 27-CV-10-24189) (the "State Court Case"). (Verified Compl. ¶ 6.) Crown Bank's original complaint in the state court case alleged breach of contract and sought a declaratory judgment to liquidate collateral. (*Id.*)

After filing the lawsuit, Crown Bank learned of additional facts constituting fraud related to (1) Nelson's use of his coins as collateral and (2) Nelson's statements as to his assets and liabilities. Specifically, Nelson had represented that the coins were valued at a minimum of $2,000,000.00 and potentially up to $4,000,000.00. (Lindquist Aff. ¶¶ 8-9, 12-13.) However, when Crown Bank had the coins independently valued in November 2010, the appraiser opined that they were valued at approximately $39,500.00 and also determined it did not include all of the coins that Nelson claimed to have pledged to Crown Bank. (*Id.* ¶ 19; Patton Aff. Ex. C

---

be issued only if the claimant has demonstrated the probability of success on the merits, and the claimant has demonstrated facts that show the existence of at least one of the grounds stated in section 570.02." One of those grounds is met "when the respondent has committed an intentional fraud giving rise to the claim upon which the civil action is brought." Minn. Stat. § 570.02 subd. 1(4).

("Marion Aff.") ¶¶ 8-11.) Furthermore, also in November 2010, Crown Bank learned through an Ownership and Encumbrance report that Nelson had misstated his real estate assets and omitted various liabilities. (Lindquist Aff. ¶¶ 22, 26-29.)

Upon learning of Nelson's fraud, Crown Bank filed an amended complaint (the "Am. Compl.") on December 14, 2010, adding allegations of fraud and intentional misrepresentation. Also on that date, December 14, 2010, Crown Bank filed a motion for Pre-Judgment Attachment with the state court on the grounds that Nelson had committed an intentional fraud upon Crown Bank and that Crown Bank had been damaged. (Verified Compl. ¶ 63.) Nelson, through counsel, filed a response on December 21, 2010, alleging that there was no fraud, but without actually denying the facts constituting fraud. On December 28, 2010, Judge Sommerville held a hearing where Nelson was given the opportunity to identify exempt property and to be heard through oral argument on Crown's motion for pre-judgment attachment. (*Id.* ¶ 64.)

On the same day, based on the affidavits, exhibits and oral testimony, Judge Sommerville entered an Order for Pre-Judgment Attachment finding that Nelson committed an "intentional fraud upon Crown Bank." (*See* Patton Aff. Ex. A ("Attachment Order"), Conclusions of Law ¶¶ 1, 4; *see also* Verified Compl. ¶ 64-65.) More specifically, Judge Sommerville made the following Findings of Fact:

1.  On August 28, 2008, Plaintiff and Defendant entered into a $3,000,000.00 Loan (the "Loan"), identified by Loan Number 4082129.

2.  Defendant executed a Promissory Note in connection with the Loan, dated August 28, 2008.

3.  Defendant delivered a personal financial statement to Crown Bank, dated July 2007, verified as of July 28, 2008, representing that:

     His two residences valued at $6,936,400;
     Total liabilities of $9,720,109.44; and
     His net worth of $18,570,215.06.

4.  In his verified July 2008 personal financial statement, Defendant stated that the appraisal of his residences was conservative, that he would be obtaining another appraisal, and that he would forward the new appraisal to Crown Bank.

5.  Crown Bank's decision to extend the Loan to Defendant was based, in part, upon the representations Defendant made in the July 2008 verified personal financial statement.

6.  Pursuant to the terms of the Promissory Note, Defendant was "required to maintain a minimum liquidity of $3,000,000.00 tested monthly" and was required to submit to a brokerage statement to Crown Bank on a monthly basis and a personal financial statement and tax return to Crown Bank on an annual basis.

7.  Defendant's signature on the personal financial statements he submitted to Crown Bank acknowledged his duty to provide "true, correct and complete" information to the bank.

8.  As security for the Loan, Defendant executed a Security Agreement dated August 28, 2008, wherein he initially pledged and granted a security interest to Crown Bank in "business investments to be delivered to the Bank from time to time," including 2,542,373 units of Visible Customer Holdings, LLC stock (the "Security Agreement").

9.  The original maturity date of the $3,000,000 Loan was August 28, 2009.

10. On or around March 11, 2009, Defendant provided Crown Bank with another verified personal financial statement. In his verified personal financial statement dated December 31, 2008, verified on March 11, 2009, Defendant Nelson represented the following as his assets and liabilities:

    His two residences at $6,952,277.09 and $989,577.13;
    Total liabilities of $10,336,011.44; and
    His net worth of $11,721,262.16.

11. In August 2009, Crown Bank agreed to extend the Loan's maturity date to February 2010.

12. In January 2010, John Lindquist, Senior Vice President at Crown Bank, contacted Defendant to remind Defendant that the Loan was set to mature, and to inform him that Crown Bank would not extend the maturity date of the Loan without obtaining additional security.

13. As of January 2010, the Loan was in default for violation of the $3,000,000 liquidity covenants.

14. In January 2010, Defendant informed Mr. Lindquist that he was willing to pledge his grandfather's coin collection, worth in excess of $2,000,000, as collateral for the Loan.

15. Mr. Lindquist asked Defendant to provide evidence of the value of the coin collection.

16. In response, Defendant provided Crown Bank with a liquidity statement together with a letter from Dave Marion at International Rarities Corporation, dated October 8, 2009 stating that Mr. Marion had appraised Defendant's coin collection, and that in his opinion Defendant's coin collection was of "substantial value" and that "the contents of the collection, if sold, would likely bring a minimum price of $2,000,000."

17. International Rarities Corporation is in the business of appraising, buying and selling coins, and rare and precious metals.

18. In October 2009, Mr. Marion had viewed and appraised a portion of Defendant's coin collection.

19. The collection Mr. Marion viewed included valuable coins, called Kruggerands, and other gold coins. At the time Mr. Marion appraised the collection, one Kruggerand was worth approximately $1,050.00 and Mr. Marion saw several boxes of one-ounce gold coins, which were most likely Kruggerands, in Defendant's collection.

20. Based upon the coin collection Defendant showed Mr. Marion, including the Kruggerands, and Defendant's representation that he had several more boxes of the same type of coins, Mr. Marion formulated an estimate that the coin collection was worth in excess of $2 million.

21. Based on Defendant's representations about the value of the coin collection, his agreement to pledge the coin collection as collateral, and the letter from Mr. Marion confirming the value of the coin collection at $2 million, Crown Bank agreed to extend the maturity date of the loan to April 28, 2011.

22. Crown Bank would not have granted this loan extension without sufficient additional collateral.

23.     On or around January 20, 2010, Defendant provided Crown Bank with a verified personal financial statement, dated June 2009 and verified on January 20, 2010. Defendant Nelson represented the following as his assets and liabilities:

> His two residences at $6,952,277.09 and $989,577.13;
> Total liabilities of $7,414,865.15; and
> His net worth of $16,135,818.91.

24.     On March 25, 2010, while Crown Bank was retrieving Defendant's coin collection from his home, Defendant again represented that the coin collection Crown Bank was obtaining as collateral was the same collection Mr. Marion had appraised and described in his October 2009 letter.

25.     On March 25, 2010, while Defendant was packing up the coin collection, Defendant stated that he had forgotten that some of the particular coins were included in the collection, making the collection more valuable than he had initially estimated. Defendant represented to Mr. Lindquist that, in light of presence of these coins, the value of the coin collection likely exceeded $3,000,0000 to $4,000,000.

26.     After Defendant and Mr. Lindquist loaded the coin collection, Defendant read and signed the amended promissory note that extended the $3,000,000 Loan's maturity date, and a new security agreement in which Mr. Nelson granted the bank a security interest in the coin collection.

27.     Thereafter, Defendant defaulted on his Loan obligations.

28.     Pursuant to its rights under the Security Agreement, on October 20, 2010, Crown Bank mailed Defendant a Notice of Disposition of Security Interest Security Agreement ("Notice"), informing Defendant that on or after November 5, 2010, Crown Bank would sell the collateral, described in the Security Agreement as Curtis C. Nelson's coin collection contained in eleven bins.

29.     On November 9, 2010, Mike Abbott, an expert numismatist from Marc One Numismatics appraised the coin collection.

30.     Mr. Abbott's appraisal revealed that the collection was not as Defendant had represented it to Crown Bank or Mr. Marion. The collection contained junk coins, and did not contain the Kruggerands that had been in the collection at the time Mr. Marion valued the coins.

31.     Mr. Abbott indicated that the coin collection was worth approximately $39,500.

32. After learning about the true value of the coin collection, in early November 2010, Mr. Lindquist requested an owner's and encumbrance report regarding Defendant from a title company (the "O&E Report").

33. The O&E Report included an April 15, 2009 pleading entitled, Findings of Fact, Conclusions of Law, Order for Judgment and Judgment and Decree from the Family Court Division of Hennepin County Courts (the "Divorce Decree").

34. According to the Divorce Decree, Defendant obtained an appraisal of his residences on July 31, 2008, approximately one month before he signed the loan documents with Crown Bank on August 28, 2008.

35. The Divorce Decree states that Defendant submitted an appraisal showing that the homes were valued at $3,689,000 as of July 31, 2008.

36. Defendant had a duty to provide notice of this material change in value to Crown Bank before the loan documents were signed.

37. Defendant did not provide Crown Bank with an updated appraisal of his personal residences.

38. Defendant continued to represent that the value of his personal residences exceeded $6,900,000 in 2009 and 2010.

39. The Divorce Decree identified significant debt Defendant owed to his parents, including a loan in the amount of $8,649,656 payable to the Glen Nelson revocable trust, as of February 8, 2007; Carlson Real Estate Company note in the amount of $1,505,964 and a note payable to Arlene Carlson; additional notes payable to Glen Nelson in the amount of $101,040 and $103,853; and a debt payable to his mother, Marilyn Nelson, in the amount of $111,886.

40. None of these debts were identified in Defendant's verified personal financial statements.

(Attachment Order, Findings of Fact, ¶¶ 1-40.)

In addition, Judge Somerville made the following Conclusions of Law:

1. Plaintiff has demonstrated facts that show that pre-judgment attachment is appropriate due to Defendant's intentional fraud upon Crown Bank to induce Crown Bank to extend a $3,000,000 Loan to Defendant and to extend the maturity date of the $3,000,000 Loan.

2. Crown Bank has a cause of action against Defendant for the breach of three loans Crown Bank made to Mr. Nelson, totaling more than $3,130,000.00 in principal. Additionally, Crown Bank has a claim against

Defendant for breach of a guaranty agreement under which Defendant agreed to absolutely and unconditionally guarantee payment of $1,000,000.00 on a $2,000,000.00 loan to a third party.

3.     The Court finds that Plaintiff has demonstrated facts to satisfy Minn. Stat. § 570.026 to warrant the grant of an attachment of Defendant's property.

4.     The conditions outlined in Minn. Stat. § 570.026 are met because the affidavits, exhibits and oral testimony establish that Defendant has committed an intentional fraud upon Crown Bank.

(Attachment Order, Conclusions of Law, ¶¶ 1-4.)

On January 12, 2011, Nelson signed a Stipulation for entry of judgment in the amount of $3,800,000.00, which was entered by the state court as an Order for Judgment on February 3, 2011.  (*See* Patton Aff. Ex. B ("Judgment Order"); *see also* Verified Compl. ¶ 66.)  Crown Bank was in the process of collecting on the judgment when Nelson filed for bankruptcy.

## II.     ADVERSARY PROCEEDING

On June 28, 2011, Crown Bank filed this adversary proceeding, seeking a determination that the state court judgment is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).  Crown Bank seeks summary judgment on this determination.

## ARGUMENT

## I.     SUMMARY JUDGMENT STANDARD.

"Summary judgment is appropriate when, viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  *Henning v. Mainstreet Bank*, 583 F.3d 975, 978 (8th Cir. 2008); *see also Lacina v. Gergen (In re Lacina)*, 451 B.R. 485, 488 (Bankr. D. Minn. 2011); Fed. R. Civ. P. 56(c).  There can be no issue for trial when no rational jury could find for the party opposing summary judgment.  *Lacina*, 451 B.R. at 488 (citing *In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008)).

Once the moving party has supported its motion for summary judgment, the non-moving party must set forth specific facts that demonstrate a genuine issue for trial. *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997). Although a court must view the facts of the case in a light most favorable to the non-moving party, the non-moving party is not entitled to unreasonable inferences and "must do more than simply show there is some metaphysical doubt as to material facts." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88 (1986). In other words, the non-moving party must provide more than a "scintilla of evidence" in its attempt to avoid summary judgment. *Lacina*, 451 B.R. at 488 (quoting *Patch*, 526 F.3d at 1180).

Instead, the non-moving party must demonstrate that there is an issue worthy for trial by producing "'significant, probative, and substantial evidence that denies the existence of one or more elements of [the non-moving party's] cause of action, or that constitute the basis for a recognized affirmative defense.'" *Lacina*, 451 B.R. at 488 (quoting *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990)). If the non-moving party cannot do so, summary judgment should be granted. *Id.*

Crown Bank has met its burden of presenting sufficient evidence to entitle it to summary judgment because (1) as a matter of law, Nelson is collaterally estopped from denying that he obtained his debt from Crown Bank through false representations and by use of a materially false financial statement; and alternatively, (2) the undisputed facts relating to Nelson's fraud demonstrate that no reasonably fact finder could find in favor of Nelson under 11 U.S.C. §§ 523(a)(2)(A) and (B). To survive Crown Bank's motion for summary judgment, therefore, the burden rests with Nelson to come forward with specific facts showing that there is a genuine issue for trial in this case. Because Nelson cannot meet this burden—and because Crown Bank

is entitled to judgment on all counts as a matter of law—the court should enter summary judgment in favor of Crown Bank.

## II. COLLATERAL ESTOPPEL BARS NELSON FROM RELITIGATING THE ISSUE OF HIS INTENTIONAL AND FRAUDULENT MISREPRESENTATIONS TO CROWN BANK AND COMPELS A DETERMINATION THAT NELSON'S DEBT TO CROWN BANK IS NON-DISCHARGEABLE PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A) AND 523(a)(2)(B).

The doctrine of collateral estoppel bars a party from relitigating an issue that was previously adjudicated. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979). Collateral estoppel applies in this adversary proceeding, giving preclusive effect to the state court's determinations regarding Nelson's intentional fraud toward Crown Bank.[2] "The majority of courts apply collateral estoppel to dischargeability determinations where the state litigation actually and necessarily decided the relevant issue." *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir. 1987). Minnesota bankruptcy courts follow this majority rule: "It is long-established that the doctrine of collateral estoppel, or 'issue preclusion,' applies in dischargeability proceedings in bankruptcy, to bar a party from relitigating discrete issues of fact that were settled via adjudication in pre-bankruptcy litigation to which the debtor was a party." *See State v. Khouri* (*In re Khouri*), 397 B.R. 111, 116-17 (Bankr. D. Minn. 2008); *accord Minn. Trust Co. of Austin v. Yanke* (*In re Yanke*), 225 B.R. 428, 432 (Bankr. D. Minn. 1998); *see also Hobson Mould Works v. Madsen* (*In re Madsen*), 195 F. 3d 988, 989 (8th Cir. 1999). Therefore, if the

---

[2] Because Nelson and Crown Bank stipulated to $3,800,000 as the amount of the judgment in the State Court Case, the amount of Nelson's debt should not be an issue in dispute before this Court. Moreover, collateral estoppel gives preclusive effect to the specific monetary amount of the state court judgment. *See Fox v. Schmit* (*In re Schmit*), 71 B.R. 587, 588 n.1 (Bankr. D. Minn. 1987) (Kressel, J.) ("[T]he specific amounts of money loaned were litigated in state court, and the doctrine of collateral estoppel precludes [the debtor] from contesting in this proceeding the state court's findings as to the amount of the debt."); *see also Ehlers v. Howell* (*In re Ehlers*), 189 B.R. 835, 840 n.7 (Bankr. N.D. Ala. 1995) (citing seven different courts for the same proposition).

elements of collateral estoppel are satisfied, this Court should grant summary judgment to Crown Bank on its claims relating to Nelson's debt.

## A. The Elements For Collateral Estoppel.

Determining the elements of collateral estoppel requires looking to Minnesota case law. *Khouri*, 397 B.R. at 117 ("Under the Federal Full Faith and Credit Act, 28 U.S.C. § 17[38], the federal courts are to apply the preclusion doctrines as they are framed by the law of the forum of the original adjudication, if that is a state court."). In Minnesota, "[c]ollateral estoppel bars the relitigation of an issue when: (1) the issue is identical to one in a prior adjudication; (2) there was a final judgment on the merits in the prior proceeding; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue." *Barth v. Stenwick*, 761 N.W.2d 502, 508 (Minn. Ct. App. 2009) (citing *Kaiser v. N. States Power, Co.*, 353 N.W.2d 899, 902 (Minn. 1984)); *accord Allstate Ins. v. Dzuik* (*In re Dzuik*), 218 B.R. 485, 489 (Bankr. D. Minn. 1998) (Kressel, J.). Minnesota courts "do not apply collateral estoppel rigidly and focus instead on whether an injustice would be worked upon the party upon whom the estoppel is urged." *Barth*, 761 N.W.2d at 508. As a result, in addition to the four factors listed above, Minnesota law requires courts to determine whether the application of collateral estoppel is equitable. *Id.*

Here, the four factors of collateral estoppel are satisfied, and equity is served by prohibiting Nelson from relitigating the issue he lost in the State Court Case, specifically the issue as to whether he intentionally and fraudulently misrepresented information relating to his loan with Crown Bank.

1.	**The issues relating to Nelson's intentional and fraudulent misrepresentations to Crown Bank that were litigated and decided in the State Court Case are identical to the issues to be decided by this Court on the dischargeability of Nelson's debt to Crown Bank.**

In order for collateral estoppel to apply, the State Court Case must have decided an issue that is identical to the issue before the Court in this matter. As previously explained by this Court, for summary judgment to be granted in an adversary proceeding based on collateral estoppel, the moving party, "must identify specific findings in the original, predicate decision that were made to support the outcome there. Then, it must link them to the elements of its claim in the current proceeding, in logical satisfaction of those elements. Only then will all material facts have been established." *Khouri*, 397 B.R. at 117; *see also Tudor Oaks LP v. Cochrane* (*In re Cochrane*), 179 B.R. 628, 630 (Bankr. D. Minn. 1995) (Kishel, C.J.) ("Where pre-petition litigation between a complaining creditor and a debtor has produced fact adjudications of adequate specificity, a creditor may move for summary judgment on the basis of the prior findings of fact. The issue in such a motion is purely one of law – whether the findings made by the nonbankruptcy tribunal meet the precise legal requirements of the theory of nondischargeability on which the creditor relies."), *aff'd*, 124 F.3d 978 (8th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998). In other words, to prevail on its non-dischargeability claims based on collateral estoppel, Crown Bank must identify the specific facts decided by the state court that satisfy the standard of 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). "If the facts thus settled do meet all of the elements of the current claim, the plaintiff will be entitled to a grant of summary judgment." *Id.*

a.	**Issues in the State Court Case.**

On December 14, 2010, Crown Bank brought a motion under Minn. Stat. § 570.02 subd. 1(4), which allows for pre-judgment attachment "when the respondent has committed an

intentional fraud giving rise to the claim upon which the civil action is brought." In the context of the motion, the specific issues were: i) whether Crown Bank gave a loan to Nelson in reliance upon Nelson's intentional and fraudulent misrepresentations and ii) whether Crown Bank extended the maturity date of the loan in reliance upon Nelson's intentional and fraudulent misrepresentations. In support of its motion, Crown Bank submitted evidence, in the form of documents and affidavit testimony, of Nelson's material misrepresentations, that Nelson knew his misrepresentations were false, that Crown Bank relied upon the intentional misrepresentations in giving him a loan and then extending it, and that as a result, Crown Bank suffered damages. Nelson opposed the motion, submitting an opposition brief and an affidavit from his lawyer. In order to issue pre-judgment attachment, the state court was required to find that Crown Bank's monetary claim was the result of an intentional fraud committed by Nelson. *See* Minn. Stat. § 570.02 subd. 1(4).

After considering the evidence and arguments submitted by both Nelson and Crown Bank and after a hearing on the motion, the state court made specific Findings of Fact, (*see* Attachment Order, Findings of Fact ¶¶ 1 – 40) and the following Conclusions of Law:

<u>**Conclusions of Law**</u>

1. … [Nelson's] intentional fraud upon Crown Bank [] induce[d] Crown Bank to extend a $3,000,000 Loan to [Nelson] and to extend the maturity date of the $3,000,000 Loan.

….

3. The Court finds that [Crown Bank] has demonstrated facts to satisfy Minn. Stat. § 570.026 to warrant the grant of an attachment of [Nelson's] property.

4. The conditions outlined in Minn. Stat. § 570.026 are met because the affidavits, exhibits and oral testimony establish that [Nelson] has committed an intentional fraud upon Crown Bank.

(Attachment Order, Conclusions of Law, ¶¶ 1, 3, 4.)  The state court agreed with Crown Bank that Crown Bank's damages were the result of Nelson's intentional fraud.  (*See* Attachment Order, Conclusions of Law ¶¶ 1, 4.)

### b.     Issues to be decided by this Court.

Before the Court is Crown Bank's motion for summary judgment on the dischargeability of Nelson's debt to the bank pursuant to U.S.C. §§ 523(a)(2)(A) and B.  In deciding the motion, the Court is guided by the factors set forth in both statutes.  The Findings of Fact made by the state court to support its determination that Nelson's assets were subject to prejudgment attachment pursuant to Minn. Stat. §570.02, subd. 1(4) are identical and "link" to the elements required under U.S.C. §§ 523(a)(2)(A) and B.  *See Khouri*, 397 Br. at 117.

### i.     The Factual Findings by the state court are identical to the elements under 11 U.S.C. § 523(a)(2)(A).

11 U.S.C. § 523(a)(2)(A) applies to false representations by the debtor used to incur debt or used to seek an extension of the debt.  The elements of 11 U.S.C. § 523(a)(2)(A) are as follows:

(1)     the debtor made a false representation;

(2)     at the time the representation was made the debtor knew it was false;

(3)     the debtor subjectively intended to deceive the creditor at the time he made the representation;

(4)     the creditor justifiably relied upon the representation; and

(5)     the creditor sustained injury as a proximate result of the misrepresentation.

*See Minn. Client Sec. Bd. v. Wyant* (*In re Wyant*), 236 B.R. 684, 694 (Bankr. D. Minn. 1999) (Kressel, J.).  Here, the Findings of Fact by the state court relating to Nelson's misstatements regarding the nature and value of his coin collection (i.e. what types of coins he owned and what

types of coins he provided to Crown Bank) pledged to Crown Bank to secure an extension of his loan satisfy these five elements.

First, in its Findings of Fact in the Order for Pre-Judgment Attachment, the state court found that Nelson made many oral false statements relating to the nature and value of his coin collection. (*Compare* Attachment Order, Findings of Fact, ¶¶ 14, 16, 24-25 *with* ¶¶ 30-31.) These falsities are material because of the gross disparity between the values as represented by Nelson and the actual values and the inconsistency in the nature of the coin collection. (*Id.*) Second, the state court found that Nelson knew his statements were false because Nelson represented that the coin collection he was giving to Crown Bank was the same coin collection he had previously valued at $2,000,000.00 and that in fact, he had forgotten about some additional coins in the collection. (*See id.* ¶¶ 24-25.) Third, the state court found that based on the totality of the facts, Nelson had committed an "intentional fraud" in order to induce Crown Bank into granting him loans and extensions on those loans. (*See* Attachment Order, Conclusions of Law ¶¶ 1, 4.) In other words the court found that Nelson intended to deceive[3] Crown Bank. Fourth, the state court found that Crown Bank relied on Nelson's misrepresentations in that Crown Bank's decisions to grant or extend loans to Nelson were based on Nelson's representations relating to his coins. (*See id.*, Findings of Fact ¶¶ 21-22, 25-26.) Fifth, the state court found that Crown Bank suffered damages as a result of Nelson's misrepresentations. (*See id.* ¶ 41; Conclusions of Law ¶¶ 2.) Therefore, each element required under 11 U.S.C. § 523(a)(2)(A) was previously found in Crown Bank's favor by the state court.

---

[3] "Intent to deceive" under 11 U.S.C. 523(a)(2)(A) is presumed when the debtor knowingly makes a false statement to induce reliance. *Merchants Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999). Thus, Nelson's intent is presumed, considering the state court's findings on his knowledge and his attempts to hide various liabilities. (*See* Attachment Order, Findings of Fact ¶¶ 34-40.)

ii.   The findings in the state court are identical to the elements under 11 U.S.C. § 523(a)(2)(B).

11 U.S.C. § 523(a)(2)(B) applies to false representations respecting the debtor's financial condition.  The elements of 11 U.S.C. § 523(a)(2)(B) are as follows:

(1)   the debtor made a written statement;

(2)   the statement was materially false;

(3)   the statement was in regard to the debtor's or an insider's financial condition;

(4)   the creditor reasonably relied on the statement; and

(5)   the debtor made the statement with an intent to deceive.

*See Neb. Coop. Corp. v. Schnuelle (In re Schnuelle)*, 441 B.R. 616, 623 (B.A.P. 8th Cir. 2011).

Here, the Factual Findings by the state court relating to Nelson's misrepresentations regarding his Personal Financial Statements (i.e. the appraisal of his houses and his total net worth based on his assets and liabilities) satisfy these five elements.

First, the state court found the Personal Financial Statements were in writing and made by the Nelson.  (*See* Attachment Order, Findings of Fact, ¶¶ 3, 10, 23.)  Second, the state court found that the representations were materially false because of the gross disparity between the stated values and actual values of his houses (*compare id.* ¶¶ 3, 10, 23 *with* ¶¶ 34-38) and of his liabilities impacting his total net worth (*compare id.* ¶¶ 3, 10, 23 *with* ¶¶ 39-40).  Third, the state court found that the statements related to Nelson's financial condition because they were statements used to demonstrate that he had sufficient assets to support his requested loan amount and loan extension.  (*Compare id.* ¶¶ 3, 10, 16, 23 *with* ¶¶ 5, 11, 21-22, 26.)  Fourth, the state court found that Crown Bank relied[4] on Nelson's misrepresentations; it found that Crown Bank's

---

[4]   "Under § 523(a)(2)(B), the reasonableness of a creditor's reliance must be determined in light of the circumstances."  *Schnuelle*, 441 B.R. at 624.  Although a creditor is supposed to look for "red flags," a creditor is not put on notice that there are misstatements merely because a document contains a misstatement.  *Id.*

decisions to grant or extend loans to Nelson were based on Nelson's representations in his Personal Financial Statements.  (*See id.* ¶¶ 5, 11.)  Fifth, the state court found that based on the totality of the facts, Nelson had committed an "intentional fraud"[5] in order to induce Crown Bank into granting him loans and extensions on those loans.   (*See* Attachment Order, Conclusions of Law ¶¶ 1, 4.)  As such, each element required under 11 U.S.C. § 523(a)(2)(B) was previously found in Crown Bank's favor by the state court.

### 2.    The Attachment Order is final.

The Order for Pre-Judgment Attachment constitutes a final judgment because not only did it consist of definitive findings of fact and conclusions of law on the issue of fraud as required under Minn. Stat. § 570.02, but it should be treated as final (1) due to the sufficiency of the court's hearing and (2) due to Nelson's actions.

First, the sufficiency of the court's hearing supports finality.  For purposes of collateral estoppel, a prior court's order must be "sufficiently firm."  *In re DEF Invs., Inc.*, 186 B.R. 671, 683 (Bankr. D. Minn. 1995) (Dreher, J.) (holding that a partial summary judgment ruling, in which the court did not direct entry of judgment on all of the class action claims, was sufficiently final).  The issue of whether a non-appealable order constitutes final judgment for collateral estoppel purposes "turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review."  *Id.* (citations omitted).[6]

---

[5]    Intent "can be proven from the surrounding circumstances, if it is shown the debtor acted with a reckless indifference to or reckless disregard of the accuracy of financial information submitted to the creditor."  *Schnuelle*, 441 B.R. at 624.  Examples are when the debtor estimates the figures or when the "nature and amount of the missing liabilities were such that Debtor had to know of them."  *Id.*

[6]    Other courts agree, stating that even a preliminary injunction may be treated as sufficiently final when the determination was not tentative and there was a full opportunity to present evidence.  *See, e.g., Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 754 (S.D.N.Y. 1990); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 995-96 (7th Cir. 1979) *Lummus Co. v. Commonwealth Oil*

Here, the Pre-Judgment Attachment Order was not tentative in nature, but was the product of an adequate hearing which was fully noticed, briefed by both parties, and argued through affidavits and oral argument. Moreover, there was opportunity for review, in that Nelson could have challenged the decision (i.e. by a summary judgment motion or by proceeding to trial), but instead, he consented to judgment in the full amount. For Nelson to now claim that the Pre-Judgment Attachment Order was not final would be to allow him to re-litigate the issue of his fraudulent conduct against Crown Bank.

Even if the Attachment Order itself is not considered a final judgment, it is well settled in Minnesota that findings of fact not reduced to judgment can be treated as "final" through the doctrines of active assent, passive acquiescence, broad equitable principles of fairness, and estoppel based on reliance. *See Moodie-Yannotti v. Swan (In re Swan)*, 156 B.R. 618, 624-27 (Bankr. D. Minn. 1993) (Kishel, C.J.) (noting that findings of fact in a jury verdict can be acquiesced to by a party, later precluding that party from re-litigating the issue in a nondischargeability case). In a case on point, the Minnesota Supreme Court held that the Minneapolis Commission on Civil Rights was collaterally estopped from re-litigating a discriminatory eviction case, when the tenant had unsuccessfully asserted a discrimination defense in the prior unlawful detainer hearing. *Ellis v. Mpls. Comm'n on Civ. Right*s, 319 N.W.2d 702 (Minn. 1982). In *Ellis*, the tenant vacated the residence at issue after receiving negative findings of fact in the unlawful detainer case, but before a final judgment. *See id.* at 704. When the landlord later defended the Minneapolis Commission's discrimination complaint on the basis of collateral estoppel, the commission claimed that the lack of final judgment, and

---

*Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) ("'Finality' . . . may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again").

the summary nature of the unlawful detainer proceeding, precluded that application of collateral estoppel. *Id.* In upholding the application of the doctrine of collateral estoppel, the Minnesota Supreme Court held that by leaving the premises and not otherwise challenging the prior findings, the tenant acquiesced to the prior findings of fact contained in the verdict, and therefore, collateral estoppel applied, even though there was no final judgment. *See id.*

Here, Nelson treated the Order for Pre-Judgment Attachment as final in two ways. First, he passively acquiesced to Crown Bank's motion by not denying the facts constituting fraud in his memorandum in opposition to pre-judgment attachment and by not filing his own affidavit denying fraud. Second, Nelson passively acquiesced by not challenging the state court's findings and instead consented to a judgment that is given preclusive effect within fifteen days after the Attachment Order.[7] Fairness principles dictate that Nelson should not be able to acquiesce by stipulating to a judgment and then later re-litigate the issue. The Order for Pre-Judgment Attachment was never challenged by Nelson; therefore, it should constitute a final judgment for collateral estoppel purposes.

### 3. Nelson, the party seeking to be estopped, was the party in the State Court Case.

In order for collateral estoppel to apply, the estopped party must have been a party (or in privity with a party) to the prior court case. Nelson, the debtor in this current adversary proceeding, was also the defendant in Crown Bank's state court action. Therefore, the parties are identical.

---

[7] This court recognizes that a judgment, decree, or equivalent order, to which the parties agree or consent, has preclusive effect. *See Falk v. Hecker* (*In re Falk*), 88 B.R. 957, 964 (Bankr. D. Minn. 1988) (Kressel, J.), *aff'd*, 98 B.R. 472 (Bankr. D. Minn. 1989). Even if the Order for Pre-Judgment Attachment were not considered final, it became sufficiently final once the court entered judgment because a pre-judgment attachment is an "inchoate lien" until judgment is entered. *See Marsh v. Wilson Bros.*, 144 N.W. 959, 959 (Minn. 1914); *see also Cent. Bank of Tampa v. U.S.*, 833 F. Supp. 892, 896 (S.D. Fla. 1993). Therefore, the "inchoate" attachment became final upon Judge Klein entering judgment based on the stipulated Order for Judgment.

**4.    Nelson was given a full and fair opportunity to be heard on the issue of his intentional and fraudulent misrepresentations to Crown Bank.**

Collateral estoppel requires Nelson to have had a full and fair opportunity to be heard on the issue at stake.  "The question of whether a party had a full and fair opportunity to litigate a matter generally focuses on 'whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties.'"  *State v. Joseph*, 636 N.W.2d 322, 328 (Minn. 2001) (quoting *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1521 (10th Cir. 1990)); s*ee North Tel, Inc. v. Brandl* (*In re Brandl*), 179 B.R. 620, 626 (Bankr. D. Minn. 1995) (Kishel, C.J.) ("Full and fair opportunity" essentially means having your day in court, and it does not require a "contested trial before a finder of fact.")

In the prior proceeding, Nelson was fully and fairly given his day in court on the issue of his intentional and fraudulent conduct toward Crown Bank.  First, he suffered from no procedural limitations in opposing Crown Bank's motion for pre-judgment attachment; he was given the full 14 days notice for the motion required by the Minnesota Rules of Civil Procedure. During that time, Nelson's counsel drafted and submitted an opposition brief and affidavit. Nelson's counsel also appeared at oral argument and argued against the motion.  Second, Nelson had a strong incentive to fully litigate the issue because Crown Bank was alleging that its damages claim was the result of fraudulent statements by Nelson that could result in pre-judgment attachment of all of his assets.  Not only did Nelson have incentive to litigate against such a finding, but he did litigate against it.  In fact, Nelson's counsel filed a 15 page opposition brief with an affidavit, in which counsel zealously argued the issue of fraud.  Third, effective litigation was not limited in any way because neither the nature nor relationship of the parties hindered Nelson's ability to argue against Crown Bank's claim of Nelson's fraud.  Nelson was

not denied counsel and was not denied the ability to submit a brief, write an affidavit, or argue at oral argument. In other words, the state court action did not merely result in a default judgment, in which Nelson was never able to participate.[8] Therefore, Nelson was already given a full and fair opportunity to be heard on the precise issue of fraud, and he should be collaterally estopped from being given another opportunity. See *State v. Joseph*, 636 N.W.2d at 328.

**B.    The Equities In This Case Favor The Application Of Collateral Estoppel To Bar Nelson From Relitigating The Issue Of His Intentional and Fraudulent Misrepresentations To Crown Bank.**

In addition to the four elements of collateral estoppel listed above, Minnesota courts also require that its application be fair. *Barth*, 761 N.W.2d at 508. In determining whether it is equitable to apply collateral estoppel, Minnesota courts look at whether the issue was "actually litigated, determined by, and essential to a previous judgment." *Id.* (citations omitted). In this case, it would be unfair for Crown Bank to be required to re-litigate Nelson's fraud against the bank.

The application of collateral estoppel does not require that an issue be "thoroughly litigated," but instead merely requires that the issue be "actually litigated." *See DEF Invs.,* 186 B.R. at 687. Therefore, when (1) a plaintiff pleads an issue in state court, (2) the defendant answers, and (3) the court receives evidence on the issue, the issue has been "actually litigated." *See AGP Grain Coop. v. White* (*In re White*), 315 B.R. 741, 747 (Bankr. D. Neb. 2004); *Miles v. Rutledge* (*In re Rutledge*), 245 B.R. 678, 683 (Bankr. D. Kan. 1999). These three considerations

---

[8]    However, in Minnesota, a case resulting in a default judgment does not mean the "full and fair opportunity" prong fails. *See In re Brandl*, 179 B.R. at 626 ("In Minnesota, a default judgment may be given full preclusive effect as to all issues pleaded in the underlying complaint, as long as the proponent satisfies all of the other elements of collateral estoppel as to those issues."). Furthermore, in Minnesota, a default judgment can even be considered a final judgment. *See Radermacher v. Sullivan* (*In re Sullivan*), 122 B.R. 720, 723 (Bankr. D. Minn. 1991) (Kishel, C.J.); *Northbrook Partners LLP v. County of Hennepin (In re Northbrook Partners LLP)*, 245 B.R. 104, 113 (Bankr. D. Minn. 2000) (Kishel, C.J.).

occurred in the State Court Case. First, Crown Bank pled fraud in its amended complaint. Second, Nelson, as the defendant, answered that complaint. And third, the court received evidence on the issue of fraud during the briefing and oral argument for pre-judgment attachment. In fact, considering the state court was actually <u>required</u> to find facts constituting an intentional fraud in order to award pre-judgment attachment, fraud was "anything but incidentally or collaterally decided." *See DEF Invs.,* 186 B.R. at 687. Therefore, the case was actually litigated.

Moreover, the issue of Nelson's intentional fraud toward Crown Bank was specifically "determined" and identified by the state court in its detailed Attachment Order. Last, the Minnesota Statute regarding pre-judgment attachments required a finding by the state court that Crown Bank's claims were the result of Nelson's <u>intentional</u> fraud. As such, the issue and ultimate determination of Nelson's intentional and fraudulent misrepresentations toward Crown Bank were "essential" to the Attachment Order.

All of these factors considered, it would not be unfair to apply the doctrine of collateral estoppel to prohibit Nelson from relitigating the issue of his fraudulent conduct toward Crown Bank. Here, the equities certainly favor this Court applying collateral estoppel in favor of Crown Bank.

Based on the foregoing analysis, Crown Bank is entitled to summary judgment based on collateral estoppel because it has identified the specific facts decided by the state court which link to each element of fraud under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). Therefore, there can be no other finding than Nelson's debt to Crown Bank being nondischargeable.

**III. THE EVIDENCE, INCLUDING ADDITIONAL INFORMATION LEARNED THROUGH DISCOVERY IN THIS PROCEEDING, SUPPORTS A FINDING THAT NELSON'S DEBT TO CROWN BANK IS NON-DISCHARGEABLE PURSUANT TO 11 U.S.C. § 523(a)(2)(A) AND 11 U.S.C. § 523(a)(2)(B).**

Even if the Court determines that collateral estoppel does not apply in this adversary proceeding, the evidence reviewed by the state court in making its determination that Nelson committed fraud, along with additional evidence produced in discovery in this adversary proceeding, justifies finding that Nelson's debt to Crown Bank is nondischargeable because of Nelson's numerous false representations to Crown Bank which satisfy the elements under 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(2)(B). First, Nelson incurred the debt by overstating the value of his net worth in his Personal Financial Statement provided to the bank to support his loan. Second, Nelson misrepresented the value and substance of the coin collection used as additional collateral in order to secure an extension of the loan's maturity date.

**A. The Undisputed Evidence Justifies Summary Judgment Pursuant To 11 U.S.C. § 523(a)(2)(A).**

As previously discussed, the elements of 11 U.S.C. § 523(a)(2)(A) are as follows:

(1)     the debtor made a false representation;

(2)     at the time the representation was made the debtor knew it was false;

(3)     the debtor subjectively intended to deceive the creditor at the time he made the representation;

(4)     the creditor justifiably relied upon the representation; and

(5)     the creditor sustained injury as a proximate result of the misrepresentation.

*Wyant*, 236 B.R. at 694. The undisputed facts relating to Nelson's misstatements regarding the nature and value of his coin collection, which were relied upon by the state court, also support a determination by this Court that these five elements are satisfied as a matter of law.

First, Nelson made many oral false statements relating to the nature and value of his coin collection. (*Compare* Lindquist Aff. ¶¶ 8-9, 12-13 *with* ¶ 19; *Compare* Marion Aff. ¶ 7 *with* ¶ 9-

11; c*ompare* Attachment Order, Findings of Fact, ¶¶ 14, 16, 24-25 *with* ¶¶ 30-31.)  These falsities are material because of the gross disparity between the values as represented by Nelson and the actual values and the inconsistency in the nature of the coin collection.  (*Id.*)  Second, Nelson either knew or should have known that the coin collection he gave to Crown Bank was not the same collection that he had had valued by Marion, considering that the coins were in Nelson's possession and he was representing that he had forgotten about some additional coins.  He either made this statement with intent to deceive or with a reckless disregard for the truth (i.e. without checking to make sure he was correct).  Third, Nelson had intent because he was aware of the fact that Crown Bank would not extend the maturity date unless he provided additional collateral with consideral value (*see* Lindquist Aff. ¶ 7) and because there would have been no reason for Nelson to claim that there were additional coins making the collection worth more than Marion's estimate if he was not trying to deceive Crown Bank.  (*See id.* ¶ 13; s*ee, also* Attachment Order, Conclusions of Law ¶¶ 1, 4.)  Fourth, Crown Bank relied on Nelson's misrepresentations because it agreed to extend the loan maturity date to Nelson based on Nelson's representations relating to his coins.  (Lindquist Aff. ¶ 10; *see also* Attachment Order., Findings of Fact ¶¶ 21-22, 25-26.)  Fifth, Crown Bank was damaged in the amount of $3,800,000, the amount stipulated to by Nelson.  (Lindquist Aff. ¶ 2; Attachment Order, Findings of Fact, ¶ 41.)  Therefore, Nelson's misstatements regarding the nature and value of his coin collection meet the requirements for a particular debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(A), and therefore Crown Bank is entitled to summary judgment on that count.

**B.      The Undisputed Evidence Justifies Summary Judgment Pursuant To 11 U.S.C. § 523(a)(2)(B).**

As previously discussed, the elements of 11 U.S.C. § 523(a)(2)(B) are as follows:

(1)      the debtor made a written statement;

(2)     the statement was materially false;

(3)      the statement was in regard to the debtor's or an insider's financial condition;

(4)     the creditor reasonably relied on the statement; and

(5)     the debtor made the statement with an intent to deceive.

*In re Schnuelle*, 441 B.R. at 623.  Here, the five elements are met based upon the misstatements and omissions contained in the Personal Financial Statements that Nelson used to secure his loan with Crown Bank in July 2008, and in his quarterly "liquidity statements."  In part, the Personal Financial Statements overstated the value of his real property and investment accounts, which collectively led to a misstatement of his net worth.  *See Norbank v. Kroh (In re Kroh)*, 87 B.R. 1004, 1008 (Bankr. W.D. Mo. 1988) (holding that misstatements in financial statement that was used to incur a $500,000 loan led to a conclusion of nondischargeability under 11 U.S.C. § 523(a)(2)(B)).

### 1.     The Personal Financial Statement was in writing.

As a threshold issue, for a debt to be obtained by fraud under 11 U.S.C. § 523(a)(2)(B) and held nondischargeable, the statement of financial condition of the debtor must be in writing. *In re Schnuelle*, 441 B.R. at 623.  In this case, the misstatements were in writing because they were included in the Personal Financial Statements that Nelson provided to Crown Bank on July 28, 2008 for purposes of securing a loan, and certified by Nelson as "true, correct, and complete".   (Lindquist Aff. ¶¶ 23-25; Attachment Order, Findings of Fact, ¶¶ 3, 10, 23.) Bankruptcy Courts routinely hold that misstatements in personal financial statements qualify as written statements under § 523(a)(2)(B).  *In re Kroh*, 87 B.R. at 1007.

### 2.     The Personal Financial Statement was materially false.

In addition to being a written statement, the statement must be materially false.  *In re Schnuelle*, 441 B.R. at 623.  Nelson's representations in his Personal Financial Statement were

materially false because of the gross disparity between the stated values and actual values of his houses, investment accounts, and liabilities. As the state court stated in its findings of fact, Nelson received an appraisal of his residences in July 2008 that stated a value of $3,689,000, yet his Personal Financial Statement dated July 28, 2008 stated a value of $6,936,400. (*Compare* Lindquist Aff. ¶¶ 23-25 *with* ¶ 27; *compare* Attachment Order, Findings of Fact, ¶¶ 3, 10, 23 *with* ¶¶ 34-38.) His misstatements as to his liabilities also impacted his total net worth. (*Compare* Lindquist Aff. ¶¶ 23-25 *with* ¶ 29; *compare id.* ¶¶ 3, 10, 23 *with* ¶¶ 39-40.)

In addition to misstating the value of his residences, Nelson materially misrepresented the value of his Trade Station Securities accounts in his statements to Crown Bank, including but not limited to the July 28, 2008 statement. The disparity became evident as a result of the discovery conducted in this adversary proceeding. Below is a summary of the statements, by date, which reflect actual account balance with Trade Stations as compared with the values reported to Crown Bank:

| Trade Station Securities | Reported to Crown | Actual Statements |
|---|---|---|
| **7-28-08 - Personal Financial Statement** | | |
| Curtis Company One | $632,932.62 | $352,285.06 |
| Curtis Nelson | $605,885.00 | $260,220.08 |
| | | |
| **12-31-08 - Personal Financial Statement** | | |
| Curtis Company One | Unknown | |
| Curtis Nelson | $299,321.85 | $28,282.64 |
| | | |
| **6-30-09 - Personal Financial Statement** | | |
| Curtis Company One | Unknown | |
| Curtis Nelson | $163,123.91 | $30,097.24 |
| | | |
| **February 2009 - Liquidity Statement** | | |
| Curtis Company One | $464,743.21 | $1,290.63 |
| Curtis Nelson | $81,131.13 | $27,220.08 |
| | | |
| **March 2009 – Liquidity Statement** | | |
| Curtis Company One | $302,352.86 | $1,290.63 |
| Curtis Nelson | $81,131.13 | $26,689.94 |

**May 2009 - Liquidity Statement**

| | | |
|---|---|---|
| Curtis Company One | $410,803.45 | $1,290.63 |
| Curtis Nelson | $163,122.91 | $26,159.04 |

**June 2009 - Liquidity Statement**

| | | |
|---|---|---|
| Curtis Company One | $310,801.08 | $1,290.63 |
| Curtis Nelson | $128,287.69 | $30,097.24 |

**September 2009 - Liquidity Statement**

| | | |
|---|---|---|
| Curtis Company One | $102,365.00 | $1,290.63 |
| Curtis Nelson | $63,362.24 | $28,349.54 |

**November 2009 - Liquidity Statement**

| | | |
|---|---|---|
| Curtis Company One | $174,132.00 | $1,290.63 |
| Curtis Nelson | $39,491.00 | $27,189.74 |

(*See* Lindquist Aff. Ex. F.)  As set forth in the Affidavit of John Lindquist and as demonstrated in the chart above, a comparison of the actual values of the securities as reported on the statements against the values reported by Nelson reveal that he was intentionally and materially overstating his net worth to the detriment of Crown Bank.  This was no accident.  In fact, Nelson was receiving "Monthly Commodity Statements" and "Monthly Customer Statements" from Trade Station at his home address, so he either knew or should have known that he was not reporting the correct values.  (*Id.* ¶ 39.)  The fact that Nelson overstated his personal interest in the Trade Station account by over $280,000 at the inception of the loan, is sufficient to be material, let alone the $3,000,000 overstatement in the value of the houses.  Last, Nelson misrepresented that over $7,000,000 in loans for which he was personally responsible were not his obligations.  Clearly, the picture Nelson was painting with his Personal Financial Statements was substantially untruthful and qualifies as material.  S*ee Avco Fin. Svcs. v. Frey (In re Frey)*, 150 B.R. 742, 745 (Bankr. D.N.D. 1992).

3. **The Personal Financial Statement was in regard to Nelson's financial condition.**

In addition to the above, the written statement must be in regards to the debtor's financial condition. *In re Schnuelle*, 441 B.R. at 623. Here, a verified Personal Financial Statement listing Nelson's assets, liabilities, and net worth as of such date, qualifies. *Dammen v. Dammen (In re Dammen)*, 167 B.R. 545, 550 (Bankr. D.N.D. 1994) (holding that a financial statement that delineates a debtor's assets, liabilities, and net worth was a writing respecting the debtor's financial condition).

4. **Crown Bank reasonably relied on the Personal Financial Statement.**

Moreover, the written statement must be relied upon by the creditor. *In re Schnuelle*, 441 B.R. at 623. Here, Crown Bank required Nelson's Personal Financial Statement as a prerequisite to providing the loan, and Crown Bank would not have given Nelson the loan based upon the correct financial information without additional collateral. (Lindquist Aff. ¶¶ 3, 28, 35-36.) Moreover, Crown Bank was not made aware of Nelson's recent appraisal of his homes, and such information would not be public. Reasonable reliance can be demonstrated by showing that "credit would not have been extended had accurate information been provided." *In re Kroh*, 87 B.R. at 1007. Crown Bank was not required to verify every statement Nelson made; instead, Crown Bank was supposed to look merely for "red flags." *See Schnuelle*, 441 B.R. at 624. Bankruptcy courts have also held that lenders are not required to verify the accuracy of a potential borrower's financial statement to show reasonable reliance. *See id.* (citations omitted). Here, Crown Bank reasonably relied on Nelson's misstatements to its detriment, providing Nelson with $3,000,000 in loan proceeds.

### 5. Nelson made the Personal Financial Statement with an intent to deceive.

Last, the written statement must be made with the intent to deceive the creditor. *In re Schnuelle*, 441 B.R. at 623. "[T]he requisite intent under § 523(a)(2)(B) can be proven from the surrounding circumstances, if it is shown the debtor acted with a reckless indifference to or reckless disregard of the accuracy of financial information submitted to the creditor." *Id.* (citations omitted). Here, the surrounding facts support the state court's finding that Nelson had the requisite intent to deceive Crown Bank. Nelson was aware that his Personal Financial Statement was required by the bank. However, Nelson acted with "a reckless indifference to or reckless disregard of the accuracy of financial information" provided in his Personal Financial Statement which is sufficient to demonstrate an intent to deceive. *See id.* Nelson recklessly disregarded the knowledge he had about the value of his residence, despite the fact that it was appraised within weeks of submitting his statement to the bank. Moreover, the chronic misrepresentations of his TradeStation account show that Nelson was recklessly inaccurate on a quarterly basis. Accordingly, this Court should follow the state court and find that Nelson "committed an intentional fraud upon Crown Bank."

There are no issues of material fact in this case because no reasonable fact finder could find an absence of fraud given all of Nelson's actions in misstating the nature and value of his coins, overstating the value of his houses, overstating his total net worth, and overstating his Trade Stations account in his Personal Financial Statement. Therefore, there can be no other finding than that of nondischargeability under 11 U.S.C. §§ 523(a)(2)A and (B).

## CONCLUSION

WHEREFORE, based on the foregoing, Crown Bank respectfully requests that the Court grant its motion for summary judgment by granting counts I and II in its Complaint and by declaring that Crown Bank's state court judgment in the amount of $3,800,000.00 is excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).

Dated: September 21, 2011

OPPENHEIMER WOLFF & DONNELLY LLP

By:  /e/ David B. Galle

Christine Lindblad (MN #277666)
David B. Galle (MN #311303)
Michelle Schjodt (MN #0390490)
Elizabeth A. Patton (MN #0391431)
3300 Plaza VII
45 South Seventh Street
Minneapolis, Minnesota 55402
Telephone: (612) 607-7000
Facsimile: (612) 607-7100

ATTORNEYS FOR PLAINTIFF CROWN BANK

OPPENHEIMER: 2884770 v05 09/21/2011

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Curtis C. Nelson,

        the Debtor.

Bky. No. 11-43113(RJK)

Chapter 11

Crown Bank,

        Plaintiff,

v.

Curtis C. Nelson,

        Defendant.

Adv. No. 11-04196

## AFFIDAVIT OF JOHN C. LINDQUIST

| | |
|---|---|
| STATE OF MINNESOTA | ) |
| | ) ss |
| COUNTY OF HENNEPIN | ) |

I, John C. Lindquist, being first duly sworn on oath, depose and say as follows:

1.    I am the Senior Vice President of Crown Bank. This affidavit is based upon my personal knowledge and I am competent to testify thereto. I submit this affidavit in support of Crown Bank's Motion for Summary Judgment.

2.    Crown Bank has a claim against Defendant Curtis C. Nelson for the breach of three loans Crown Bank made to Mr. Nelson, totaling more than $3,800,000.00 in outstanding principal. Additionally, Mr. Nelson has breached a guaranty agreement under which he agreed

to absolutely and unconditionally guarantee payment of up to $1,000,000.00 in principal on a $2,000,000.00 loan to a related third party.

3.      On or about August 28, 2008, Defendant Nelson executed a Promissory Note for Loan Number 4082129 in the original principal amount of $3,000,000.00 in favor of Crown Bank (the "Original $3,000,000 Note"). Crown Bank's decision to extend a $3 million loan (the "$3,000,000 Loan") to Mr. Nelson was based on his verified personal financial statement, which Mr. Nelson delivered to Crown Bank prior to August 28, 2008 in order to induce the bank into making the $3,000,000 Loan. Attached hereto as <u>Exhibit A</u> is the personal financial statement executed by Mr. Nelson on July 28, 2008, verifying the attached consolidated balance sheet, which Mr. Nelson attested represented his assets and liabilities. Crown Bank relied on Defendant Nelson's verified statements that his net worth was in excess of $18,000,000.00 in extending the $3,000,000 Loan to Mr. Nelson.

4.      As security for the Original $3,000,000.00 Note, Defendant Nelson executed a Security Agreement dated August 28, 2008, wherein he pledged and granted a security interest to Crown Bank in "business investments to be delivered to the Bank from time to time," including 2,542,373 units of Visible Customer Holdings, LLC stock (the "Security Agreement").

5.      The original maturity date of the $3,000,000 Loan was August 28, 2009.

6.      In August 2009, when the Original $3,000,000 Note matured, Crown Bank agreed to extend the loan's maturity date to February 2010.

7.      In January 2010, I contacted Defendant Nelson to inform him that the $3,000,000 Loan would mature on February 28, 2010, and that Crown Bank would not agree to extend the maturity date of the loan again unless Mr. Nelson provided additional security for repayment of the loan and a current liquidity statement as required by the Promissory Note which accurately

represented his net worth. Mr. Nelson had not provided a liquidity statement since September 2009, and the September 2009 statement demonstrated that the loan was in violation of the minimum of $3,000,000.00 liquidity covenant as his reported liquidity was $2,800,000.00. From the time Crown Bank originated the $3,000,000.00 loan, Mr. Nelson's liquidity had diminished significantly, and in January 2010 Crown Bank could not extend the loan again unless it obtained additional collateral as security. I informed Mr. Nelson that Crown Bank required additional collateral in order to extend the maturity date and to keep the loan in compliance.

8.      In response, on or about January 15, 2010, Mr. Nelson told me he understood the bank's concern and told me that he had a coin collection from his grandfather, Curtis Carlson, that was worth in excess of $2 million. He stated that he had a letter from an appraiser establishing the value of the coins, and that he was willing to pledge the $2 million coin collection as additional collateral for the $3,000,000 Loan in order to induce the bank into extending the maturity date.

9.      In order to verify the value of the coins, as well as Mr. Nelson's then current net worth to evaluate the bank's risk in agreeing to extend the loan, I asked Mr. Nelson to provide a current liquidity statement and evidence of the value of the coin collection. Mr. Nelson provided a liquidity statement, dated November 2009. In addition, Mr. Nelson provided a letter dated October 8, 2009 from Dave Marion, of International Rarities Corporation, stating that he reviewed the contents of Curtis Nelson's coin and precious metals collection and that the collection was of "substantial value." In Mr. Marion's professional opinion, "the contents of the collection, if sold, would likely bring a minimum price of $2,000,000." A copy of the November 2009 liquidity statement, and the letter Mr. Nelson provided, is attached hereto as Exhibit B.

10. Based on Mr. Nelson's representations and agreement to pledge the coin collection as collateral, and based on the letter from Dave Marion presented by Mr. Nelson, confirming the value of the coin collection at $2 million, Crown Bank agreed to extend the maturity date of the loan to April 28, 2011. Crown Bank would not have granted this loan extension without this additional collateral, in the value presented.

11. Crown Bank agreed to a short extension of the maturity date of Loan Number 4082129, until April 28, 2010, to finalize the loan documents and secure the additional collateral.

12. On March 25, 2010, I went to Mr. Nelson's personal residence for the purpose of retrieving the coin collection. Mr. Nelson again confirmed that the coin collection he was providing to Crown Bank was the collection appraised by Dave Marion, as set forth in the October 2009 letter.

13. As I was helping Mr. Nelson load the collection into plastic bins, Mr. Nelson stated that he had forgotten that certain coins were included in the collection, which likely increased the value of the collection to $3 or $4 million.

14. After we loaded the coin collection, I asked Mr. Nelson to read and sign the relevant loan documents, including the security agreement. Mr. Nelson's girlfriend was also present during the signing. Mr. Nelson read and signed the amended promissory note that extended the $3,000,000 Loan's maturity date, and a new security agreement in which Mr. Nelson granted the bank a security interest in the coin collection. He crossed out the liquidity covenant that was previously part of the loan agreement since Crown Bank agreed to substitute the coin collection in lieu of the liquidity covenant.

15. After he signed the necessary documents, Mr. Nelson and I delivered the 11 plastic bins that contained the coin collection to Brinks U.S. Offices located at 830 Boone

Avenue N., Golden Valley, MN 55427 ("Brinks") to hold the coin collection for Crown Bank's benefit.

16.     Several months later, Mr. Nelson defaulted on his $3,000,000 Loan obligations to Crown Bank and Crown Bank provided notice of default to Mr. Nelson. After proper notice to Mr. Nelson, Crown Bank proceeded to liquidate the coin collateral.

17.     In early November 2010, I made arrangements with International Rarities Corporation to complete a second appraisal and to obtain a bid on the collection for purposes of selling the coins to apply the proceeds to Mr. Nelson's obligations to the bank. International Rarities Corporation recommended I work with Marc One Numismatics, who provided Mike Abbott, a numismatist, to complete the appraisal.

18.     On November 5, 2010 I contacted Brinks to have the collection delivered to Crown Bank's Edina location on Monday, November 8, 2010. The collection arrived at Crown Bank on Monday, November 8, 2010 and was held in Crown Bank's secure room, which is maintained under 24 hour video surveillance.

19.     On November 9, 2010, Mr. Abbott completed his appraisal of the coin collection. During his review, Mr. Abbott stated that the collection was not as it was represented to Dave Marion. Mr. Abbott informed me that the collection contained "junk coins" – not the gold Kruggerands that had been in the collection at the time Mr. Marion valued the coins. Based upon Mr. Abbott's appraisal, Marc One Numismatics indicated that the coin collection was worth approximately $39,500. Attached hereto as <u>Exhibit C</u> an e-mail from Marc One Numismatics regarding Mr. Abbott's opinion on the value of the coin collection.

20.    Based on the fact that the coin collection is not what Mr. Nelson purported it to be, Crown Bank is now undersecured on the $3,000,000 Loan and does not have sufficient collateral to satisfy Mr. Nelson's debt obligations.

21.    In November 2010, after we learned the true value of the coin collection, I ran a UCC search on Mr. Nelson and discovered that Mr. Nelson had pledged different coins as collateral for a loan from Jordan Family, LLC. Pat Jordan, another customer of Crown Bank, is the owner of Jordan Family, LLC. I spoke with Ms. Jordan and confirmed that Mr. Nelson had offered to pledge part of his valuable coin collection to her to secure a $300,000 loan. Mr. Nelson offered what he represented to Ms. Jordan were $500,000 worth of coins in exchange for a loan in the amount of $300,000. Thereafter, Mr. Nelson defaulted on his loan obligation to Jordan Family, LLC. Ms. Jordan later learned that the coins were only worth $35,000. I asked Mr. Abbott about the value of the coins secured by the loan from Jordan Family, LLC, and Mr. Abbott confirmed that the coins are worth less than $35,000.

22.    At or around the same time, I requested an owner's and encumbrance report from a title company (the "O&E Report"), and learned that Mr. Nelson made numerous misrepresentations on verified personal financial statements and liquidity statements he had previously delivered to Crown Bank.

23.    Specifically, in July 2008, prior to loaning Mr. Nelson $3 million, Mr. Nelson provided Crown Bank with a verified personal financial statement. In his personal financial statement dated July 2007, verified as of July 28, 2008, Mr. Nelson represented his assets and liabilities, including:

A.    His two residences valued at $6,936,400;

B.    Total liabilities of $9,720,109.44; and

C.      His net worth of $18,570,215.06.

In this verified July 2008 personal financial statement, Mr. Nelson stated that the appraisal of his residences was conservative, that he would be obtaining another appraisal, and that he would forward the new appraisal to Crown Bank. *See* Exhibit A.

24.      In March 2009, prior to Crown Bank's agreement to extend the maturity date of $3,000,000 Loan, Mr. Nelson provided Crown Bank with another verified personal financial statement. In his verified personal financial statement dated December 31, 2008, verified on March 11, 2009, Mr. Nelson represented the following as his assets and liabilities:

A.      His two residences at $6,952,277.09 and $989,577.13;

B.      Total liabilities of $10,336,011.44; and

C.      His net worth of $11,721,262.16.

A true and correct copy of the Mr. Nelson's personal financial statement, verified on March 11, 2009, is attached hereto as Exhibit D.

25.      In January 2010, prior to Crown Bank's agreement to extend the maturity date of the $3,000,0000 Loan, Mr. Nelson provided Crown Bank with a third verified personal financial statement. In his verified personal financial statement dated June 2009, verified on January 20, 2010, Mr. Nelson represented the following as his assets and liabilities:

A.      His two residences at $6,952,277.09 and $989,577.13;

B.      Total liabilities of $7,414,865.15; and

C.      His net worth of $16,135,818.91.

A true and correct copy of the Defendant Nelson's personal financial statement, verified on January 20, 2010, is attached hereto as Exhibit E.

26.     The O&E report I obtained in November 2010 included an April 15, 2009 pleading entitled, Findings of Fact, Conclusions of Law, Order for Judgment and Judgment and Decree from the Family Court Division of Hennepin County Courts (the "Divorce Decree").

27.     The Divorce Decree listed the value of Mr. Nelson's personal residences. Specifically, at paragraph 22, the Divorce Decree states that Mr. Nelson submitted an appraisal showing that the homes were valued at $3,689,000 as of July 31, 2008, not $6,936,400.00 as he had represented just three days earlier on his July 28, 2008 verified personal financial statement.

28.     Mr. Nelson had a duty to provide notice of this material change in value to Crown Bank before the loan documents were signed, but he never did. He never provided the updated appraisal to Crown Bank and he continued to misrepresent the value of his personal residences in 2009 and 2010. If Crown Bank had known the information reported in the Divorce Decree, Crown Bank would not have agreed to loan Mr. Nelson $3 million or would have required sufficient additional collateral to secure a loan.

29.     In addition, the Divorce Decree identified significant debt Mr. Nelson owed to his parents, including a loan in the amount of $8,649,656 payable to the Glen Nelson revocable trust, as of February 8, 2007; Carlson Real Estate Company note in the amount of $1,505,964 and a note payable to Arlene Carlson; additional notes payable to Glen Nelson in the amount of $101,040 and $103,853; and a debt payable to his mother, Marilyn Nelson, in the amount of $111,886. None of these debts were identified to Crown Bank when Mr. Nelson verified his personal financial statement at the time Crown Bank agreed to loan Mr. Nelson $3 million or at the time Crown Bank agreed to extend the loan's maturity date. The amount of this debt is significant. Crown Bank would not have agreed to loan Mr. Nelson $3 million or would have required sufficient additional collateral to secure the loan.

30.     Additionally, as evidenced by the other debts and liabilities identified in the Divorce Decree, Mr. Nelson substantially inflated his net worth to Crown Bank in order to improperly induce Crown Bank to loan him $3,000,000.00.

31.     The Divorce Decree states that the dissolution proceedings were sealed. Crown Bank will request these documents in discovery to determine whether Mr. Nelson made other misrepresentations to Crown Bank.

32.     In late July 2008, Crown Bank Credit Officer, Margaret Lancaster, and I met with Curtis C. Nelson for approximately three hours to go over the details of the verified personal financial statement, executed by Mr. Nelson on July 28, 2008, which is attached as Exhibit A.

33.     The first issue we raised with Mr. Nelson was the $7,000,000.00 long-term liability to Mr. Nelson from the Curtis L. Carlson Trust. Mr. Nelson explained that the reason the $7,000,000.00 was not included in the total long term liabilities was because this liability was contingent debt that he would not have to pay due to the loan being forgiven over time through future distributions from the trust. Mr. Nelson went on to explain that he is the beneficiary of the trust and that the $7,000,000.00 loan was a quasi-loan from himself. Additionally, Mr. Nelson stated that the "Interest on Note to Trust" in the amount of $68,722.60 was accrued interest on the $7,000,000.00 note and would also be forgiven in the future.

34.     Mr. Nelson indicated that the $120,000 "Family Support" liability was also excluded from his total current liabilities. He explained that the $120,000 "Family Support" was included on the personal financial statement for informational purposes only as it was a monthly expense, and not a liability, as required by his divorce.

35.     Crown Bank did not extend the $3,000,000 Loan to Mr. Nelson based upon his name and lineage.

36.     The primary reason Crown Bank agreed to extend the $3,000,000 Loan to Mr. Nelson was based upon his verified statements that his net worth was in excess of $18,000,000 and his representation that he had liquid assets in excess of $10,600,000.

37.     Marc One Numismatics, Inc. stated it would not purchase coins in bins #7 through #9 and #11 in its November 17, 2010 e-mail providing an appraisal of the coin collection because they "are face value." There were no rare coins in the aforementioned bins. Marc One's e-mail is attached as Exhibit C. The face value of the coins in bins #7 through #9 and #11 is worth less than $10,000.00 in Crown Bank's estimation.

38.     Following the bankruptcy petition, Crown Bank served subpoenas on Trade Stations Securities, Inc. ("Trade Stations"), Peregrine Financial Group, Inc. ("Peregrine") and Stephen Hastings ("Hastings"). Upon information and belief, Hastings was an individual hired by Curtis Nelson ("Nelson") to liquidate his assets prior to his bankruptcy petition. Trade Stations and Peregrine are investment companies identified on the personal financial statements and liquidity statements that Nelson provided to Crown Bank in order to qualify for the loans, or as required under the applicable loan documents. Upon reviewing documents provided by Trade Stations and Hastings, Crown Bank has learned that the liquidity and personal financial statements previously misrepresented were further misrepresented.

39.     Upon reviewing the documents provided by Trade Stations, I compared the value of the Securities reflected on the Trade Station statements to the value reported by Nelson. I then created an Excel chart reflecting the difference in values, which is attached as Exhibit F. Specifically, I printed Nelson's liquidity statements and personal financial statements and entered the amount reported to Crown Bank for Curtis Company One and Nelson on separate lines. I took the corresponding month's Trade Stations statements for both entities and included

them in the spreadsheet. If there was no change in activity in a certain month, I carried the prior month's balance forward. I was conservative and included all of the numbers for each entity, meaning that I did not limit my totals to the accounts listed on Nelson's documents. If I would have, the difference would be significantly lower. To determine the difference in values, I subtracted the actual amount from the amount reported to Crown Bank, and I also performed calculations to determine the percentage amount that Nelson overstated the values. The difference between the actual values as reported on the Trade Station statements and the values reported by Nelson in a given month vary from $12,301.26 to $463,452.58. Stated another way, the percentage that Nelson overstated ranges from a 145.24% overstatement to a 36,009.02% overstatement. Moreoever, "Monthly Commodity Statements" and "Monthly Customer Statements" from Trade Station were addressed to Nelson's home address, so he had knowledge that he was not reporting accurate values. Crown Bank relied to its detriment on these overstated values because Crown Bank would not have been able to grant or extend a loan based on the actual numbers. In fact, if Nelson had accurately stated his Trade Stations security amounts, he would have been in default.

Further, Affiant sayeth not.

Dated: September 21, 2011

Subscribed and sworn to
before me this 21st day of September,
2011

_____
Notary Public

MARY E FERKINGSTAD
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2012

_____
John C. Lindquist

# EXHIBIT A

# CERTIFICATION AND ADDENDA
## TO
### PERSONAL FINANCIAL STATEMENT

**This addenda is <u>required</u> if you are submitting <u>self prepared financial</u> statement. Please <u>sign</u> and <u>date</u> your financial statement and complete this addenda.**

**If you are completing the enclosed Crown Bank financial statement the addenda is not required.**

I, Curtis C Nelson the undersigned maker of the attached personal financial statement, do by my signature affixed below, make the following representations as addenda to the attached personal financial statement for the purposes of inducing Crown Bank, to grant certain credit accommodations on my behalf.

1. I have not gone through bankruptcy, nor do I have any unsatisfied judgment against me (us).

2. None of my assets are pledged or debts secured except as shown.

3. I have 3_____ dependents.

4. I (we) am (are) married ☐, unmarried ☐, separated ☐. Answer this question only if this financial statement is provided in conjunction with a request for secured credit or applicant is seeking a joint account with a spouse.

5. My (our) contingent liabilities are:

   As Endorser or Guarantor $_____0_____
   Taxes on Appreciated Assets  As reported on the Balance sheet
6. Other  None

7. The title to all assets shown on the attached statement are in my (our) name except for the following:

   As noted on the balance sheet

The attached statement, submitted for the purpose of obtaining credit, is true, correct and complete, and fairly shows my (our) financial condition at the time indicated to the best of my knowledge. I (we) will give prompt written notice of any subsequent change in such financial condition occurring before discharge of any financial obligation to you. I (we) understand that you will retain my (our) personal financial statement whether or not you approve the credit in connection with which it is submitted. You are authorized to check my (our) credit and employment or any other information contained herein.

X _Curtis C. N_____  Social Security Number: ██████  Date: 7/28/08

X _____  Social Security Number: _____  Date: _____

**EXHIBIT A**

# CURTIS C NELSON CONSOLIDATED BALANCE SHEET
## July '07

## ASSETS

### ShortTermAssets( Liquid)

**Cash and Equivalents**

| | | | |
|---|---|---|---|
| Curtis C Nelson | US Bank Checking | $72,895.97 | |
| Curtis Inc. | US Bank Checking | $1,596.72 | |
| Curtis Inc. | US Bank Savings | $1,050.00 | |
| Curtis Co.'s One | US Bank Checking | $1,247.57 | |
| Curtis Co.'s One | US Bank Savings | $1,281.26 | |
| Total Cash and Equivalents | | | $78,071.52 |

**Marketable Securities**

| | | | |
|---|---|---|---|
| Curtis C Nelson | Charles Schwab | $134,310.00 | |
| | Lind-WaldocK | $243.52 | |
| | TradeStation | $605,885.00 | |
| | Alaron | $1,028,977.02 | |
| Curtis Co.'s One | Tradestation | $632,932.62 | |
| | Alaron | $3,110,255.66 | |
| Curt Co. Commodities | Alaron | $4,794,857.16 | |
| Total Marketable Securities | | | $10,307,460.98 |
| Total Short Term Assets | | | $10,385,532.50 |

### Long Term Assets

**Investments**

| | | | |
|---|---|---|---|
| Carlson Real Estate LP Interest | (Personal Investment) | | $536,000.00 |
| Curtis Co Condos* | (Curt Co. Condominiums) | | $4,235,994.00 |
| Exponential One LLC** | (Curt Co. Commodities) | | $0.00 |
| Visible Customer | (Curt Co. Customer) | | $3,000,000.00 |
| Total Long Term Investments | | | $7,771,994.00 |

**Other Assets**

| | | |
|---|---|---|
| 1553-1555 Linner Rd. Estate*** | $6,936,400.00 | |
| Personal Property**** | $1,773,500.00 | |
| CCI Retirement | $800,398.00 | |
| McLaren auto - est. market value | $345,000.00 | |
| 2008 Mercedes 550 AMG | $82,500.00 | |
| 2008 Mercedes CL63 AMG | $120,000.00 | |
| Cobalt Boat - est. market value | $10,000.00 | |
| Mastercraft Boat - est. marketv alue | $65,000.00 | |
| Total Other Assets | | $10,132,798.00 |
| Total Long Term Assets | | $17,904,792.00 |

## TOTAL ASSETS
$28,290,324.50

\*      Deposits or Options on Real Property
\*\*      $3,500,000 of Curt Co. Commodities Marketable Securities portfolio is committed to this investment.
\*\*\*      This should be conservative. I have an est. from '05 showing total value of just under $9,000,000
     I have ordered a new Appraisal and will forward a copy when complete.

## Liabilities

### Current

| | |
|---|---|
| Family Support  (12 Mo. @ 10k each) | $120,000.00 |
| Credit Cards      (Est.) | $17,255.00 |
| Other Current    (Est.) | $4,260.00 |

**Accrued Liabilities**

| | |
|---|---|
| Intrest on Note to Trust | $68,722.50 |
| Property Taxes | $20,458.00 |
| Income Taxes ('08 payable in '09)* | $2,004,000.00 |
| Capital Gains    (Woodland Cove Property LLC) | $920,000.00 |

**Total Current Liabilities**       $3,034,685.50

### Long Term Liabilities

| | |
|---|---|
| Curtis L Carlson Trust for Curtis C Nelson | $7,000,000.00  (CONTINGENT) |
| JPMC Primary Mortgage | ($3,201,998.00)   Mortgage |
| Wells Fargo HELOC | $157,879.17 |
| Wells Fargo HELOC | $373,198.07 |
| Wells Fargo #34 | $445,823.37 |
| Wells Fargo #67 | $296,524.35 |
| Chase-Mclearen | $150,000.98 |
| Mercedes-Mercedes | $60,000.00 |
| Mercedes-Mercedes | $0.00 |
| Payable to Visible Customer | $2,000,000.00 |

**Total Long Term Liabilities**       $6,685,423.94

**Total Liabilities**       **$9,720,109.44**

## Net Worth       $18,570,215.06

\* - I believe this number is at least 6-700k high based on missing deductions, Largerly legal fees in the Carlson matter.

Prepared by RDG & Associates
3/4/2008

****        Includes over $1,000,000 of artwork and $500,000 of Jewelery,Gemstones, and Rare Coins.(@mkt.)

# EXHIBIT B

# Current Liquidity Statement

## Nov '09

### Curtis C. Nelson

| | |
|---|---|
| Cash | $150,901 |
| Bank Accounts | $39,491 ✓ NOV. |
| Tradestation Securities | $38,859 ✓ NOV. |
| Interactive Brokergage | $13,567 ✓ SEP.+NOV. |
| Charles Schwab/ Lind-Waldock | $300,000 |
| Glen Nelson (Property Sale)   *Paid in Dec.* | $1,050,000 ✓ E-MAIL |
| Trust Recievable | $542,844 ✓ APR. |
| US Bank Esc.  SUBMIT BREEF - RELEASE 90 DAYS END OF FEB. | |
| | |
| **Total** | $2,135,663 |

### Curtis Co.'s One LLC

| | |
|---|---|
| Bank Accounts | $35,985 |
| Tradestation Securities | $174,132 ✓ |
| Interactive Brokergage | $1,564,509 ✓ NOV. |
| | |
| **Sub-Total** | $1,774,626 |

*Other Current Recievables*

| | |
|---|---|
| Visable Customer Line | $4,236,000 |
| | |
| TOTAL LIQUIDITY FOR CURTIS NELSON | $8,146,288 |
| W/O Current V.C. Recievable | $3,910,288 |

MINNE COIN COLLECTION                    $2,000,000
                                         ATTACHED LETTER

**EXHIBIT B**

### *MANSFIELD TANICK & COHEN, P.A.*
### *Carol Jarnig, Legal Assistant*
#### *Attorneys at Law*
1700 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis MN 55402-4511
Telephone: 612/341-1240 - Direct
FAX Telephone: 612/339-3161
www.mansfieldtanick.com

## FAX TRANSMISSION SHEET

**DATE:**     October 8, 2009

**TO:**     Dave Marion          **Phone:** 612-330-9049

**FROM:**     Carol Jarnig, Legal Assistant to Gregory M. Miller

**RE:**     Valuation of Coins

**MESSAGE OR INSTRUCTIONS:** Per your conversation with Greg Miller, attached please find the letter.

**ORIGINAL TO FOLLOW IN MAIL:**     No

If you have not received the entire document please

Call **612-341-1240** as soon as possible.

CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION

THE ENTIRE ATTACHMENT TO THIS TELECOPIER COVER LETTER AND THE CONTENTS THEREOF ARE CONFIDENTIAL, ARE INTENDED ONLY FOR THE USE OF THE ABOVE-NAMED INDIVIDUAL OR ENTITY, AND MAY BE SUBJECT TO THE ATTORNEY/CLIENT PRIVILEGE AND/OR THE ATTORNEY WORK PRODUCT PRIVILEGE. THE SENDING OF THIS COMMUNICATION BY TELECOPIER IS NOT INTENDED AS A WAIVER OF ANY PRIVILEGES LISTED ABOVE. IF YOU, AS THE READER OF THIS COVER LETTER, ARE NOT THE INTENDED RECIPIENT OF THIS COVER LETTER AND THE ATTACHED INFORMATION, YOU ARE HEREBY NOTIFIED OF YOUR OBLIGATION TO DELIVER IT TO THE INTENDED RECIPIENT WITHOUT READING THE ATTACHMENTS YOURSELF OR DISSEMINATING ANY OF THIS COMMUNICATION, INCLUDING THE ATTACHMENTS, TO ANY OTHER PERSON OR ENTITY. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE AND RETURN UNREAD THIS COVER LETTER AND THE ATTACHMENTS TO THE ABOVE ADDRESS VIA THE U. S. POSTAL SERVICE. THANK YOU.

October 8, 2009

Mr. Curtis Carlson Nelson
1555 Linner Rd.
Minnetonka, MN 55391

   Re: Valuation of Coins and Precious Metals
      International Rarities Corp.

Dear Mr. Nelson:

As you know, last week I reviewed the contents of your coin and precious metals collection. In my review of the collection it is apparent to me that the collection is of substantial value. In my professional opinion, the contents of the collection, if sold, would likely bring a minimum price of $2,000,000.

Please don't hesitate to request our assistance in any transaction involving the collection.

Truly yours,

Dave Marion
International Rarities Corp.

cc. Rajive Das

# EXHIBIT C

From: John Lindquist
Sent: Wednesday, November 17, 2010 2:11 PM
To: loan ops
Subject: FW: mpls deal

Curtis Nelson file -- Corr. Sec. "11-17-10 email form Marc Crane on valuation of coins."

**John Lindquist**
Senior Vice President

CROWN BANK
6600 FRANCE AVENUE, SUITE125
EDINA, MINNESOTA 55435
PH: 952-285-2716
FX: 952-285-5900

From: Marc Crane [mailto:marconeinc@aol.com]
Sent: Wednesday, November 17, 2010 2:03 PM
To: John Lindquist
Cc: Marconeinc@aol.com; vopalensky281@yahoo.com
Subject: mpls deal

John C. Lindquist
952-285-1500
Jlindquist@crown-bank.com

RE: Coins Appraised by Mike Abbott/Marc One

Dear Mr. Lindquist,

For the bins labeled #1 through #6, inclusively, plus the bin labeled #10 that Brinks showed Mike Abbott on 11/9/10 at Crown Bank in Edina, MN
we would pay:

US $39,500.00

for bins labeled #7 through #9, inclusively, and bin #11 that Brinks showed Mike Abbott on 11/9/10 at Crown Bank in Edina, MN we would not buy as the coins are face value and should be deposited with any bank.

I will mail you a formal letter documenting this offer.

Thank you,

Marc Crane
Marc One Numismatics, Inc.
P.O. Box 8048
Newport Beach, CA 92658
800-346-2721
714-258-0954

cc: Mike Abbott

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

11/17/2010

**EXHIBIT C**

# EXHIBIT D

Scanned by AK

# CERTIFICATION AND ADDENDA
## TO
## PERSONAL FINANCIAL STATEMENT

**This addenda is required if you are submitting self prepared financial statement. Please sign and date your financial statement and complete this addenda.**

**If you are completing a Crown Bank financial statement the addenda is not required.**

I, (we) Curtis Nelson the undersigned maker(s) of the attached personal financial statement, do by my (our) signature(s) affixed below, make the following representations as addenda to the attached personal financial statement for the purposes of inducing Crown Bank, to grant certain credit accommodations on my (our) behalf.

1. I (we) ☑ have ☐ have not gone through bankruptcy.

2. I (we) ☑ have ☐ have no unsatisfied judgment against me (us).

3. None of my (our) assets are pledged or debts secured except as shown.

4. I (we) have O dependents.

5. I (we) am (are) married ☐, unmarried ☐, separated ☑. Answer this question only if this financial statement is provided in conjunction with a request for secured credit or applicant is seeking a joint account with a spouse.

6. My (our) contingent liabilities are:

    As Endorser or Guarantor $_____  
    Taxes on Appreciated Assets $_____  }  See Statements
    Other $_____

7. The title to all assets shown on the attached statement are in my (our) name except for the following:

    _As noted on Financial Statements_

8. My (our) annual income information is as follows:

| Annual Income | Applicant | Co-applicant |
|---|---|---|
| Salary Return of Capital | 600,000 | |
| Commissions | | |
| Dividends | | |
| Interest | | |
| Net Rental Income | | |
| Other | 1,000,000 | |
| Total Income | | |

The attached statement, submitted for the purpose of obtaining credit, is true, correct and complete, and fairly shows my (our) financial condition at the time indicated to the best of my knowledge. I (we) will give prompt written notice of any subsequent change in such financial condition occurring before discharge of any financial obligation to you. I (we) understand that you will retain my (our) personal financial statement whether or not you approve the credit in connection with which it is submitted. You are authorized to check my (our) credit and employment or any other information contained herein.

X _____ Social Security Number: _____ Date: 3/11/09

X _____ Social Security Number: _____ Date: ___

**EXHIBIT D**

# Curtis C. Nelson
## Consolidated Balance Sheet

### Cash and Equivalents

| | |
|---|---:|
| Curtis Checking/ Savings | $541,325.46 |
| Schwab One Checking | $1,651.00 |
| Funds Held in Escrow | $542,003.00 |
| *Total Cash and Equivalents* | $1,084,979.46 |

### Marketable Securities

| | |
|---|---:|
| Lind Waldock | $37,658.25 |
| Tradestation | $299,321.85 |
| Interactive Brokers | $18,569.23 |
| *Total Marketable Securities* | $355,549.33 |

| | |
|---|---:|
| *Total Short Term Assets* | *$1,421,959.56* |

### Other Assets

| | | |
|---|---|---:|
| Residence 1555 | (Forsyth) | $6,952,277.09 |
| Residence 1553 | | $989,577.13 |
| Personal Property*** | (Including all Jewelry and Art) | $1,452,000.00 |
| McLaren Auto | (Dealer Estimate) | $295,000.00 |
| Mercedes | (Kelly B-Book) | $94,500.00 |
| Mastercraft Boat | (MasterCraft Used Catalog) | $60,000.00 |
| Deferred Comp & CCI Legacy | | $935,000.00 |
| Curtis CO. One LLC-Equity | (Totally Illiquid-Negative Cash Flow) | $9,849,459.82 |
| Cobalt Boat | | $7,500.00 |
| *Total Other Assets* | | *$20,635,314.04* |

| | |
|---|---:|
| **TOTAL ASSETS** | **$22,057,273.60** |

12-31-08

## LIABILITIES

*Current Liabilities*

| | |
|---|---:|
| Amex | $0.00 |
| Advanta | $2,456.21 |
| B of A | $64,234.91 |
| US Bank | $12,748.49 |
| Buy.com | $5,318.55 |
| Chase | $2,838.95 |
| All Other | $17,345.00 |
| **Current Liabilities** | **$104,942.11** |

*Accrued Liabilities*

| | | |
|---|---|---:|
| Property Taxes | | $51,071.43 |
| Income Taxes | (Includes $960,000 of Capital Gains Tax) | $2,670,429.00 |
| **Total Accrued Liabilities** | | **$2,721,500.43** |

## TOTAL CURRENT LIABILITIES $2,826,442.54

## LONG TERM LIABILITIES

| | |
|---|---:|
| JP Morgan primary mortgage | $3,153,907.69 |
| Wells Fargo HELOC (1) | $157,045.27 |
| Wells Fargo HELOC (2) | $373,389.73 |
| Wells Fargo (34) | $374,311.86 |
| Wells Fargo (67) | $267,914.35 |
| Chase-McLaren | $139,500.00 |
| Mercedes | $43,500.00 |
| Crown Bank | $3,000,000.00 |

## TOTAL LONG TERM LIABILITIES $7,509,568.90

## TOTAL LIABILITIES $10,336,011.44

## NET WORTH $11,721,262.16

# EXHIBIT E

# CERTIFICATION AND ADDENDA
## TO
## PERSONAL FINANCIAL STATEMENT

**This addenda is <u>required</u> if you are submitting <u>self prepared financial</u> statement. Please <u>sign</u> and <u>date</u> your financial statement and complete this addenda.**

(If you are completing the enclosed Crown Bank financial statement the addenda is not required)

I, (we) _Curtis C. Nelson_ the undersigned maker(s) of the attached personal financial statement, do by my (our) signature(s) affixed below, make the following representations as addenda to the attached personal financial statement for the purposes of inducing Crown Bank, to grant certain credit accommodations on my (our) behalf.

1. I (we) have ☐ have not ☑ gone through bankruptcy, nor do I (we) have any unsatisfied judgment against me (us).

2. None of my (our) assets are pledged or debts secured except as shown.

3. I (we) have ___0___ dependents.

4. I (we) am (are) married ☐, unmarried ☑, separated ☐, Answer this question only if this financial statement is provided in conjunction with a request for secured credit or applicant is seeking a joint account with a spouse.

5. My (our) contingent liabilities are:

   As Endorser or Guarantor $_____
   Taxes on Appreciated Assets $_____
   Other $_____

6. The title to all assets shown on the attached statement are in my (our) name except for the following:

   _____
   _____

The attached statement, submitted for the purpose of obtaining credit, is true, correct and complete, and fairly shows my (our) financial condition at the time indicated to the best of my knowledge. I (we) will give prompt written notice of any subsequent change in such financial condition occurring before discharge of any financial obligation to you. I (we) understand that you will retain my (our) personal financial statement whether or not you approve the credit in connection with which it is submitted. You are authorized to check my (our) credit and employment or any other information contained herein.

X _____ Social Security Number: ███████ Date: 1/20/10

X _____ Social Security Number: _____ Date: _____

**EXHIBIT E**

# Curtis C. Nelson
## Balance Sheet
### June '09

## Assets

### Cash and Equivelents

| | |
|---|---|
| Curtis Checking/ Savings | $502,792.00 |
| Schwab One Checking | $1,651.00 |
| Funds Held in Escrow | $562,003.00 |
| **Total Cash and Equivalents** | **$1,066,446.00** |

### Marketable Securities and Notes

| | |
|---|---|
| Lind Waldock | $15,195.26 |
| Tradestation | $163,123.91 |
| Interactive Brokers | $34,741.50 |
| Curtis Co.'s One Note Recievable | $1,600,000.00 |
| **Total Marketable Securities and Notes** | **$1,813,060.67** |
| **Total Current Assets** | **$2,879,506.67** |

### Other Assets

| | | |
|---|---|---|
| Residence 1555 | (Forsyth) | $6,952,277.09 |
| Residence 1553 | | $989,577.13 |
| Personal Property | (Including all Jewelry and Art) | $2,350,000.00 |
| McLaren Auto | (Dealer Estimate) | $295,000.00 |
| Mercedes | (Kelly B-Book) | $94,500.00 |
| Mastercraft Boat | (MasterCraft Used Catalog) | $60,000.00 |
| Deferred Comp & CCI Legacy | | $935,000.00 |
| Curtis CO. One LLC-Equity | | $8,988,323.17 |
| Cobalt Boat | | $6,500.00 |
| **Total Other Assets** | | **$20,671,177.39** |

## TOTAL ASSETS

$23,550,684.06

RDG & Assosiates   July '09

# LIABILITIES

### Current Liabilities

| | |
|---|---:|
| B of A | $79,946.20 |
| US Bank | $0.00 |
| Buy.com | $6,926.14 |
| Chase | $2,838.95 |
| All Other | $17,345.00 |
| *Total Current Liabilities* | **$107,056.29** |

### Accrued Liabilities

| | |
|---|---:|
| Property Taxes | $25,536.00 |
| *Total Accrued Liabilities* | $25,536.00 |
| | **$132,592.29** |

### Long Term Liabilities

| | |
|---|---:|
| JP Morgan primary mortgage | $3,131,899.03 |
| Wells Fargo HELOC (1) | $157,055.57 |
| Wells Fargo HELOC (2) | $372,759.91 |
| Wells Fargo (34) | $224,420.00 |
| Wells Fargo (67) | $222,138.35 |
| Chase-McLaren | $134,500.00 |
| Mercedes | $39,500.00 |
| Crown Bank | $3,000,000.00 |
| *Long Term Liabilities* | **$7,282,272.86** |

## TOTAL LIABILITIES $7,414,865.15

## NET WORTH | $16,135,818.91 |

RDG & Assosiates   July '09

# EXHIBIT F

| Trade Station Securities | Reported to Crown | Actual Statements | Difference | Overstatement Percentage |
|---|---|---|---|---|
| **7-28-08 - Personal Financial Statement** | | | | |
| Curtis Company One | $632,932.62 | $352,285.06 | -$280,647.56 | 179.66% |
| Curtis Nelson | $605,885.00 | $260,220.08 | -$345,664.92 | 232.84% |
| **12-31-08 - Personal Financial Statement** | | | | |
| Curtis Company One | Unknown | | | |
| Curtis Nelson | $299,321.85 | $28,282.64 | -$271,039.21 | 1058.32% |
| **6-30-09 - Personal Financial Statement** | | | | |
| Curtis Company One | Unknown | | | |
| Curtis Nelson | $163,123.91 | $30,097.24 | -$133,026.67 | 541.99% |
| **February 2009 - Liquidity Statement** | | | | |
| Curtis Company One | $464,743.21 | $1,290.63 | -$463,452.58 | 36009.02% |
| Curtis Nelson | $81,131.13 | $27,220.08 | -$53,911.05 | 298.06% |
| **March 2009 - Liquidity Statement** | | | | |
| Curtis Company One | $302,352.86 | $1,290.63 | -$301,062.23 | 23426.77% |
| Curtis Nelson | $81,131.13 | $26,689.94 | -$54,441.19 | 303.98% |
| **May 2009 - Liquidity Statement** | | | | |
| Curtis Company One | $410,803.45 | $1,290.63 | -$409,512.82 | 31829.68% |
| Curtis Nelson | $163,122.91 | $26,159.04 | -$136,963.87 | 623.58% |
| **June 2009 - Liquidity Statement** | | | | |
| Curtis Company One | $310,801.08 | $1,290.63 | -$309,510.45 | 24081.35% |
| Curtis Nelson | $128,287.69 | $30,097.24 | -$98,190.45 | 426.24% |
| **September 2009 - Liquidity Statement** | | | | |
| Curtis Company One | $102,365.00 | $1,290.63 | -$101,074.37 | 7931.40% |
| Curtis Nelson | $63,362.24 | $28,349.54 | -$35,012.70 | 223.50% |
| **November 2009 - Liquidity Statement** | | | | |
| Curtis Company One | $174,132.00 | $1,290.63 | -$172,841.37 | 13492.02% |
| Curtis Nelson | $39,491.00 | $27,189.74 | -$12,301.26 | 145.24% |

Note: Some statements not included do to non-activity in the account

Note: After July, 2009, the statements accounts remain almost unchanged.

**EXHIBIT F**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Curtis C. Nelson,

Debtor.

Bky. No. 11-43113(RJK)

Chapter 11

---

Crown Bank,

Plaintiff,

v.

Curtis C. Nelson,

Defendant.

Adv. No. 11-04196

---

## AFFIDAVIT OF ELIZABETH A. PATTON

---

STATE OF MINNESOTA )
) ss.
COUNTY OF HENNEPIN )

Elizabeth A. Patton, being first duly sworn on oath, states:

1.     I am one of the attorneys representing Crown Bank in the above-captioned matter. This affidavit is based upon my personal knowledge and I am competent to testify thereto. I submit this Affidavit in support of Plaintiff's Motion for Summary Judgment against Defendant Curtis C. Nelson.

2.     A true and correct copy of Judge Sommerville's Order for Pre-Judgment Attachment, which was attached as Exhibit 27 to Crown Bank's complaint, is attached as Exhibit A.

3.     A true and correct copy of the Stipulation and Order for Entry of Judgment as well as Judge Klein's Order for Judgment and Notice of Entry of Judgment is attached as <u>Exhibit</u> <u>B</u>.

4.     A true and correct copy of the Affidavit of David L. Marion ("Marion Aff.") dated November 23, 2010 is attached as <u>Exhibit C</u>.

FURTHER AFFIANT SAITH NOT.

Dated:  September 21, 2011

_____
Elizabeth A. Patton

Subscribed and sworn to before me this 21st
day of September 2011.

_____
NOTARY PUBLIC

KRISTIN K. HENRICHS
Notary Public-Minnesota
My Commission Expires Jan 31, 2015

2

# EXHIBIT A

STATE OF MINNESOTA

COUNTY OF HENNEPIN

FILED

2010 DEC 28 PM 3: 30

BY _____DEPUTY
HENN CO. DISTRICT
COURT ADMINISTRATOR

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE: CONTRACT

---

Crown Bank,

          Plaintiff,

vs.

Curtis C. Nelson

          Defendant.

Court File No. 27-CV-10-24189
Judge John J. Sommerville

**[PROPOSED] ORDER FOR PRE-
JUDGMENT ATTACHMENT**

---

The above-captioned matter was brought before this Court on the 28th day of December, 2010 upon the Plaintiff's motion for pre-judgment attachment. The motion and supporting affidavits and exhibits were submitted to the Court. At the hearing, Defendant was given the opportunity to identify exempt property, without waiver of the right to claim exemption in property not identified at the hearing.

This Court, having heard the arguments of counsel, having reviewed the memoranda and affidavits submitted by the parties, having considered all of the files, records and proceedings in this action, and being otherwise fully advised, makes the following specific findings required by Minnesota Statute section 570.026.

The following persons submitted affidavits to the Court in support of Plaintiff's Motion for Pre-Judgment Attachment:

    a.     John C. Lindquist
              Senior Vice President, Crown Bank

    b.     David Marion
              International Rarities Corporation

**EXHIBIT A**

The affidavits and Verified Second Amended Complaint are attached hereto and incorporated herein.

## **FINDINGS OF FACT**

The affidavits and exhibits submitted in support of Plaintiff's Motion for Pre-Judgment Attachment adequately support the finding of the following specific facts:

1. On August 28, 2008, Plaintiff and Defendant entered into a $3,000,000.00 Loan (the "Loan"), identified by Loan Number 4082129. (Affidavit of John C. Lindquist "Lindquist Aff." ¶ 3; Verified Second Amended Complaint ("SAC") Ex. A.)

2. Defendant executed a Promissory Note in connection with the Loan, dated August 28, 2008. (*Id.*)

3. Defendant delivered a personal financial statement to Crown Bank, dated July 2007, verified as of July 28, 2008, representing that:

    (1)    His two residences valued at $6,936,400;
    (2)    Total liabilities of $9,720,109.44; and
    (3)    His net worth of $18,570,215.06.

(Lindquist Aff. ¶¶ 3, 22, Ex. A.)

4. In his verified July 2008 personal financial statement, Defendant stated that the appraisal of his residences was conservative, that he would be obtaining another appraisal, and that he would forward the new appraisal to Crown Bank. (Lindquist Aff. ¶ 22, Ex. A.)

5. Crown Bank's decision to extend the Loan to Defendant was based, in part, upon the representations Defendant made in the July 2008 verified personal financial statement. (Lindquist Aff. ¶ 3.)

6. Pursuant to the terms of the Promissory Note, Defendant was "required to maintain a minimum liquidity of $3,000,000.00 tested monthly" and was required to submit to a brokerage statement to Crown Bank on a monthly basis and a personal financial statement and

tax return to Crown Bank on an annual basis. (Lindquist Aff. ¶ 3.)

7. Defendant's signature on the personal financial statements he submitted to Crown Bank acknowledged his duty to provide "true, correct and complete" information to the bank. (Lindquist Aff. Exs. A, D, E.)

8. As security for the Loan, Defendant executed a Security Agreement dated August 28, 2008, wherein he initially pledged and granted a security interest to Crown Bank in "business investments to be delivered to the Bank from time to time," including 2,542,373 units of Visible Customer Holdings, LLC stock (the "Security Agreement"). (Lindquist Aff. ¶ 4; SAC Ex. B.)

9. The original maturity date of the $3,000,000 Loan was August 28, 2009. (Lindquist Aff. ¶ 5.)

10. On or around March 11, 2009, Defendant provided Crown Bank with another verified personal financial statement. In his verified personal financial statement dated December 31, 2008, verified on March 11, 2009, Defendant Nelson represented the following as his assets and liabilities:

        (1)    His two residences at $6,952,277.09 and $989,577.13;
        (2)    Total liabilities of $10,336,011.44; and
        (3)    His net worth of $11,721,262.16.

(Lindquist Aff. ¶ 22, Ex. D.)

11. In August 2009, Crown Bank agreed to extend the Loan's maturity date to February 2010. (Lindquist Aff. ¶ 6.)

12. In January 2010, John Lindquist, Senior Vice President at Crown Bank, contacted Defendant to remind Defendant that the Loan was set to mature, and to inform him that Crown Bank would not extend the maturity date of the Loan without obtaining additional security. (Lindquist Aff. ¶ 7.)

13.     As of January 2010, the Loan was in default for violation of the $3,000,000 liquidity covenants. (*Id.*)

14.     In January 2010, Defendant informed Mr. Lindquist that he was willing to pledge his grandfather's coin collection, worth in excess of $2,000,000, as collateral for the Loan. (Lindquist Aff. ¶ 8.)

15.     Mr. Lindquist asked Defendant to provide evidence of the value of the coin collection. (Lindquist Aff. ¶ 9.)

16.     In response, Defendant provided Crown Bank with a liquidity statement together with a letter from Dave Marion at International Rarities Corporation, dated October 8, 2009 stating that Mr. Marion had appraised Defendant's coin collection, and that in his opinion Defendant's coin collection was of "substantial value" and that "the contents of the collection, if sold, would likely bring a minimum price of $2,000,000." (Lindquist Aff. ¶ 9, Ex. B.)

17.     International Rarities Corporation is in the business of appraising, buying and selling coins, and rare and precious metals. (Affidavit of David L. Marion ("Marion Aff.") ¶ 2.)

18.     In October 2009, Mr. Marion had viewed and appraised a portion of Defendant's coin collection. (Marion Aff. ¶¶ 3, 4.)

19.     The collection Mr. Marion viewed included valuable coins, called Kruggerands, and other gold coins. At the time Mr. Marion appraised the collection, one Kruggerand was worth approximately $1,050.00 and Mr. Marion saw several boxes of one-ounce gold coins, which were most likely Kruggerands, in Defendant's collection. (Marion Aff. ¶ 5.)

20.     Based upon the coin collection Defendant showed Mr. Marion, including the Kruggerands, and Defendant's representation that he had several more boxes of the same type of coins, Mr. Marion formulated an estimate that the coin collection was worth in excess of $2

million. (Marion Aff. ¶ 7.)

21.     Based on Defendant's representations about the value of the coin collection, his

agreement to pledge the coin collection as collateral, and the letter from Mr. Marion confirming

the value of the coin collection at $2 million, Crown Bank agreed to extend the maturity date of

the loan to April 28, 2011. (Lindquist Aff. ¶ 10.)

22.     Crown Bank would not have granted this loan extension without sufficient

additional collateral. (*Id.*)

23.     On or around January 20, 2010, Defendant provided Crown Bank with a verified

personal financial statement, dated June 2009 and verified on January 20, 2010. Defendant

Nelson represented the following as his assets and liabilities:

        (1)     His two residences at $6,952,277.09 and $989,577.13;
        (2)     Total liabilities of $7,414,865.15; and
        (3)     His net worth of $16,135,818.91.

(Lindquist Aff. ¶ 25, Ex. E.)

24.     On March 25, 2010, while Crown Bank was retrieving Defendant's coin

collection from his home, Defendant again represented that the coin collection Crown Bank was

obtaining as collateral was the same collection Mr. Marion had appraised and described in his

October 2009 letter. (Lindquist Aff. ¶ 12.)

25.     On March 25, 2010, while Defendant was packing up the coin collection,

Defendant stated that he had forgotten that some of the particular coins were included in the

collection, making the collection more valuable than he had initially estimated. Defendant

represented to Mr. Lindquist that, in light of presence of these coins, the value of the coin

collection likely exceeded $3,000,0000 to $4,000,000. (Lindquist Aff. ¶ 13.)

26.     After Defendant and Mr. Lindquist loaded the coin collection, Defendant read and

signed the amended promissory note that extended the $3,000,000 Loan's maturity date, and a new security agreement in which Mr. Nelson granted the bank a security interest in the coin collection. (Lindquist Aff. ¶ 14.)

27.     Thereafter, Defendant defaulted on his Loan obligations.  (Lindquist Aff. ¶ 16.)

28.     Pursuant to its rights under the Security Agreement, on October 20, 2010, Crown Bank mailed Defendant a Notice of Disposition of Security Interest Security Agreement ("Notice"), informing Defendant that on or after November 5, 2010, Crown Bank would sell the collateral, described in the Security Agreement as Curtis C. Nelson's coin collection contained in eleven bins. (SAC Ex. M.)

29.     On November 9, 2010, Mike Abbott, an expert numismatist from Marc One Numismatics appraised the coin collection. (Lindquist Aff. ¶¶ 17, 18.)

30.     Mr. Abbott's appraisal revealed that the collection was not as Defendant had represented it to Crown Bank or Mr. Marion.  The collection contained junk coins, and did not contain the Kruggerands that had been in the collection at the time Mr. Marion valued the coins. (Lindquist Aff. ¶ 19; Marion Aff. ¶¶ 9, 11.)

31.     Mr. Abbott indicated that the coin collection was worth approximately $39,500. (Lindquist Aff. ¶ 19, Ex. C.)

32.     After learning about the true value of the coin collection, in early November 2010, Mr. Lindquist requested an owner's and encumbrance report regarding Defendant from a title company (the "O&E Report").  (Lindquist Aff. ¶ 22.)

33.     The O&E Report included an April 15, 2009 pleading entitled, Findings of Fact, Conclusions of Law, Order for Judgment and Judgment and Decree from the Family Court Division of Hennepin County Courts (the "Divorce Decree").  (Lindquist Aff. ¶ 26.)

34.     According to the Divorce Decree, Defendant obtained an appraisal of his residences on July 31, 2008, approximately one month before he signed the loan documents with Crown Bank on August 28, 2008. (Lindquist Aff. ¶¶ 27, 3.)

35.     The Divorce Decree states that Defendant submitted an appraisal showing that the homes were valued at $3,689,000 as of July 31, 2008. (Lindquist Aff. ¶ 27.)

36.     Defendant had a duty to provide notice of this material change in value to Crown Bank before the loan documents were signed. (Lindquist Aff. ¶ 28.)

37.     Defendant did not provide Crown Bank with an updated appraisal of his personal residences. (*Id.*)

38.     Defendant continued to represent that the value of his personal residences exceeded $6,900,000 in 2009 and 2010. (Lindquist Aff. ¶ 28, Exs. D, E.)

39.     The Divorce Decree identified significant debt Defendant owed to his parents, including a loan in the amount of $8,649,656 payable to the Glen Nelson revocable trust, as of February 8, 2007; Carlson Real Estate Company note in the amount of $1,505,964 and a note payable to Arlene Carlson; additional notes payable to Glen Nelson in the amount of $101,040 and $103,853; and a debt payable to his mother, Marilyn Nelson, in the amount of $111,886. (Lindquist Aff. ¶ 29.)

40.     None of these debts were identified in Defendant's verified personal financial statements. (*Id.*)

41.     The amount of Crown Bank's claims against Defendant total $4,262,275.22 in principal, interest and late charges and fees. (Lindquist Aff. ¶ 2.)

## CONCLUSIONS OF LAW

1.     Plaintiff has demonstrated facts that show that pre-judgment attachment is appropriate due to Defendant's intentional fraud upon Crown Bank to induce Crown Bank to

extend a $3,000,000 Loan to Defendant and to extend the maturity date of the $3,000,000 Loan.

2.    Crown Bank has a cause of action against Defendant for the breach of three loans Crown Bank made to Mr. Nelson, totaling more than $3,130,000.00 in principal.  Additionally, Crown Bank has a claim against Defendant for breach of a guaranty agreement under which Defendant agreed to absolutely and unconditionally guarantee payment of $1,000,000.00 on a $2,000,000.00 loan to a third party.

3.    The Court finds that Plaintiff has demonstrated facts to satisfy Minn. Stat. § 570.026 to warrant the grant of an attachment of Defendant's property.

4.    The conditions outlined in Minn. Stat. § 570.026 are met because the affidavits, exhibits and oral testimony establish that Defendant has committed an intentional fraud upon Crown Bank.

Based on the foregoing findings, IT IS HEREBY ORDERED that:

1.    Defendant Nelson is ordered to disclose in writing all of his interests in real and personal property and any and all interests in partnerships, limited liability companies, and corporations by January X, 2011 to Christine N. Lindblad, Oppenheimer Wolff & Donnelly LLP, 3300 Plaza VII, 45 South Seventh Street, Minneapolis, MN 55402.

2.    Plaintiff shall, upon receipt of Defendant's identification of property and assets, identify Defendant's non-exempt property for attachment and submit a Writ of Attachment to the Court identifying the property to be attached.

3.    The sheriff of Hennepin County or of any other county of this State where the property listed in the Writ of Attachment may be found shall attach such property without delay by seizing possession of said property and retaining the same in his or her custody under further Order of the Court of by stipulation of the parties. The sheriff shall assist Plaintiff concerning all

8

reasonable requests related to the execution of the Writ of Attachment.

      4.      Nothing in this Order should be construed to attach property that is exempt from seizure pursuant to Minnesota or federal law.

      5.      This Order shall remain in place until further order by the Court, or by agreement of the parties.

12/28/10

_____
Judge John J. Sommerville

2841887 v02 12/14/2010

# EXHIBIT B

STATE OF MINNESOTA

COUNTY OF HENNEPIN

FILED

2011 FEB -2 PM 1:40

BY_____

HENN CO. DISTRICT DEPUTY
COURT ADMINISTRATOR

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE: CONTRACT

---

Crown Bank,

Plaintiff,

vs.

Curtis C. Nelson,

Defendant.

Court File No.  27-CV-10-24189
Judge Joseph R. Klein

**STIPULATION AND ORDER
FOR ENTRY OF JUDGMENT**

---

Plaintiff Crown Bank ("Plaintiff") and Defendant Curtis C. Nelson ("Defendant") hereby stipulate to the entry of judgment against the Defendant in accordance with the terms of the Stipulation set forth herein.

### BACKGROUND

1.      On October 5, 2010, Plaintiff commenced the above-captioned action by serving a Summons and Complaint upon Defendant.

2.      On January 12, 2011, the parties engaged in Court ordered mediation before Judge Robert H. Lynn, and an agreement was reached on the following terms:

3.      Through this Stipulation, the parties request the Court to enter an Order for Judgment in the amount of $3,800,000.00, in the form attached hereto as Exhibit A.

**EXHIBIT B**

## STIPULATION

4.    <u>Amount Owed to Plaintiff.</u>   Defendant owes Plaintiff the amount of $3,800,000.00 as of January 12, 2011.

5.    <u>Entry of Judgment.</u>  The parties agree that Plaintiff shall be entitled to file this Stipulation and Order for Judgment in the amount of $3,800,000.00, in the form attached hereto as Exhibit A, after the occurrence of an Event of Default (as defined below).

6.    <u>Events of Default.</u>  The following shall be events of default ("Events of Default") entitling the Plaintiff to have judgment entered pursuant to Paragraph 5:

    a.    By January 21, 2011, Plaintiff and Defendant have not entered into an agreement acceptable to Plaintiff in its sole discretion regarding the satisfaction of the obligations of Defendant to Plaintiff; and/or

    b.    Defendant transfers, assigns and/or grants a lien or security interest in any of his assets to any third party without the prior written consent of Plaintiff, or order of the Court.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

Dated: January 12, 2011

CROWN BANK

By: John C. Lindquist, Senior Vice President

Dated: January 12, 2011

**OPPENHEIMER WOLFF & DONNELLY LLP**

Christine N. Lindblad, #277666
David B. Galle, #311303
Michelle R. Schjodt, #390490
3300 Plaza VII Building
45 South Seventh Street
Minneapolis, MN 55402
Telephone:  612-607-7000
Facsimile:  612-607-7100

**ATTORNEYS FOR PLAINTIFF CROWN BANK**

Dated: January 12, 2011

Curtis C. Nelson

Dated: January 12, 2011

**HINSHAW & CULBERTSON LLP**

Thomas G. Wallrich, #213354
Peter L. Crema Jr., #218868
Heather L. Marx, #321163
333 South Seventh Street, Suite 2000
Minneapolis, MN 55402
Telephone:  612-333-3434
Facsimile :  612-334-8888

**ATTORNEYS FOR DEFENDANT CURTIS G. NELSON**

STATE OF MINNESOTA

COUNTY OF HENNEPIN

FILED

2011 FEB -2 PM 9: 03

BY_____DEPUTY
HENN CO. DISTRICT
COURT ADMINISTRATOR

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE: CONTRACT

---

Crown Bank,

                Plaintiff,

vs.

Curtis C. Nelson,

                Defendant.

Court File No. 27-CV-10-24189
Judge Joseph R. Klein

**ORDER FOR JUDGMENT**

---

       Based upon the Stipulation of the parties regarding entry of judgment, and for good cause shown, IT IS HEREBY ORDERED,

       1.    Plaintiff Crown Bank is entitled to judgment in the amount of $3,800,000.00 against Defendant Curtis C. Nelson.

       **LET JUDGMENT BE ENTERED IMMEDIATELY.**

Dated this ___3-d___ day of ___February___ 2011.

                BY THE COURT:

                _____
                The Honorable Joseph R. Klein
                Judge of the Fourth Judicial District

**EXHIBIT A**

4

State of Minnesota
Hennepin County

District Court
Fourth Judicial District

Court File Number: **27-CV-10-24189**

Case Type: Contract

**Notice of Entry of
Judgment**

CHRISTINE LINDBLAD NESSA
OPPENHEIMER WOLFF & DONNELLY
45 S 7TH ST STE 3300
MINNEAPOLIS MN 554021609

---

**In Re: CROWN BANK vs Curtis C Nelson**

You are notified that judgment was entered on February 03, 2011.

Dated: February 3, 2011

Mark S. Thompson
Court Administrator

Deputy Court Administrator
Hennepin County District Court
300 South Sixth Street, C-3
Minneapolis MN 55487-0332
612-348-3169

cc: THOMAS GREGORY WALLRICH
M SUE WILSON

A true and correct copy of this notice has been served by mail upon the parties herein at
the last known address of each, pursuant to Minnesota Rules of Civil Procedure, Rule
77.04.



RECEIVED
FEB 7 2011
CHRISTINE LINDBLAD

State of Minnesota
Hennepin County

District Court
Fourth Judicial District

| Court File Number: | 27-CV-10-24189 |
|---|---|

Case Type:  Contract

## Notice of Entry of Judgment

**CHRISTINE LINDBLAD NESSA**
**OPPENHEIMER WOLFF & DONNELLY**
**45 S 7TH ST STE 3300**
**MINNEAPOLIS MN 554021609**

**CROWN BANK vs Curtis C Nelson**

You are hereby notified that a judgment has been entered in the above entitled matter.

| Judgment Information | |
|---|---|
| Entered Date | **February 03, 2011** |
| Debtor(s) | **Curtis C Nelson.** |
| Creditor(s) | **CROWN BANK** |
|  |  |
| Monetary Award: |  |
| Monetary Amount: | $3,800,000.00 |
|  |  |
|  |  |
|  |  |
|  |  |

A true and correct copy of this notice has been served by mail upon the parties.  Please be advised that notices sent to attorneys are sent to the lead attorney only.

Note: Costs and interest will accrue on any money judgment amounts from the date of entry until the judgment is satisfied in full.

Dated: February 3, 2011

Mark S. Thompson
Court Administrator
Hennepin County District Court
300 South Sixth Street, C-3
Minneapolis MN  55487-0332
612-348-3169



RECEIVED
FEB 7 2011
CHRISTINE LINDBLAD

# EXHIBIT C

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE: CONTRACT

---

Crown Bank,

Plaintiff,

vs.

Curtis C. Nelson

Defendant.

Court File No. 27-CV-10-24189
Judge John J. Sommerville

**AFFIDAVIT OF DAVID L. MARION**

---

COUNTY OF HENNEPIN    )
                      )
STATE OF MINNESOTA    )

I, David L. Marion, being first duly sworn upon oath, depose and say as follows:

1.  I am the CEO and President of International Rarities Corporation.  This affidavit is based upon my personal knowledge and I am competent to testify thereto.

2.  International Rarities Corporation is a Minnesota company that buys and sells gold, rare and valuable coins and other precious metals.

3.  In or around October 2009, I was asked to review and appraise the contents of Mr. Curtis Carlson Nelson's coin and precious metals collection.

4.  In early October 2009, I and my employee, Byron Copland, went to Mr. Nelson's personal residence and reviewed the coins that Mr. Nelson showed me.

5.  The collection I reviewed in October 2009 consisted of rare and valuable coins called Kruggerands.  At the time I appraised the collection, one Kruggerand was worth approximately $1,050.00 and I can recall seeing several boxes of one ounce gold coins, most

EXHIBIT C

likely Kruggerands, in Mr. Nelson's collection. The inclusion of the Kruggerands and other gold pieces attributed to the value of Mr. Nelson's collection.

6. Mr. Nelson indicated to me that he had several additional boxes which included the same type of coins.

7. I reviewed the attached letter, dated October 8, 2009, and agreed to substance of the letter based on the collection Mr. Nelson had shown me and his representation that he had several additional boxes which included the same type of coins. I agreed that, based on what I had seen, and Mr. Nelson's representations, that "the contents of the collection, if sold, would likely bring a minimum price of $2,000,000." A true and correct copy of the October 8, 2009 letter is attached as Exhibit A.

8. Several months later, my CFO and Managing Director, Jacob Schlaeger, was contacted by Crown Bank to complete a second appraisal. International Rarities Corporation was also offered an opportunity to submit a closed bid on the collection. Since I had previously seen the collection and knew that it contained Krugerrands and other gold coins, I contacted my exclusive distributor, Marc One Numismatics. Marc One is a well respected and recognized expert in numismatics. Marc One referred me to Mike Abbott, one of its expert numismatists to complete the appraisal for Crown Bank.

9. On November 9, 2010, Mr. Abbott completed his appraisal of the coin collection. Mr. Abbott informed me that the collection was not as it had been represented. The collection did not include the Krugerrands that had been in the collection at the time I provided an appraisal in October 2009 and was worth less than $39,500.00.

10. I was very surprised to learn that the contents of the collection had significantly changed from October 2009.

11. The value of the limited number of coins I was shown in October 2009 would have been significantly more than the $39,500 valued for Mr. Nelson's entire collection of eleven bins of coins appraised on November 9, 2010. I would not have had my supplier fly in to appraise such an insignificant amount.

Further, Affiant sayeth not.

Dated: _11/23/10_

_____
David L. Marion

Subscribed and sworn to
before me this 23rd day of Nov., 2010

_Kris K Scott_
Notary Public

KRIS K. SCOTT
Notary Public-Minnesota
My Commission Expires Jan 31, 2015

October 8, 2009

Mr. Curtis Carlson Nelson
1555 Linner Rd.
Minnetonka, MN 55391

Re:     Valuation of Coins and Precious Metals
        International Rarities Corp.

Dear Mr. Nelson:

As you know, last week I reviewed the contents of your coin and precious metals collection. In my review of the collection it is apparent to me that the collection is of substantial value. In my professional opinion, the contents of the collection, if sold, would likely bring a minimum price of $2,000,000.

Please don't hesitate to request our assistance in any transaction involving the collection.

Truly yours,

Dave Marion
International Rarities Corp.

cc. Rajive Das

**EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Curtis C. Nelson,

             Debtor.

Bky. No. 11-43113(RJK)

Chapter 11

---

Crown Bank,

             Plaintiff,

v.

Curtis C. Nelson,

             Defendant.

Adv. No. 11-04196

---

## ORDER FOR SUMMARY JUDGMENT

---

This case came before the court on the motion of the plaintiff, Crown Bank, seeking summary judgment. Based upon all of the files and records,

IT IS ORDERED:

1. The plaintiff's motion for summary judgment is granted,

2. Counts I and II of the Plaintiff's complaint are granted;

3. The Defendant's debt to Crown Bank in the amount of $3,800,000.00 is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).

LET JUDGMENT BE ENTERED ACCORDINGLY

Dated:

_____
Robert J. Kressel
United States Bankruptcy Court

2885290.01
23719.15

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Curtis C. Nelson,

                    Debtor.

Bky. No. 11-43113(RJK)

Chapter 11

Crown Bank,

                    Plaintiff,

v.

Curtis C. Nelson,

                    Defendant.

Adv. No. 11-04196

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of September, 2011, I caused the following documents:

Notice of Hearing and Motion for Summary Judgment; Memorandum of Law in Support of Motion for Summary Judgment; Supporting Affidavits and [Proposed] Order

to be filed electronically with the Clerk of Court through ECF and that ECF will send an e-notice

of the electronic filing to those requesting such notice.


_____/e/ David B. Galle_____

2898096.01
23719.15